UNITED STATES of America, Plaintiff–Appellee,

v.

Adam Victor GUERRA–MAREZ, Esperanza Adame, Maria Paredes–Moya, and Wenseslada Reyes–Moya, Defendants–Appellants.

No. 90–1057.

United States Court of Appeals, Fifth Circuit.

April 1, 1991.

Rehearing Denied May 29, 1991.

O. Jan Tyler, Sands & Tyler, Lawrence Maxwell, Jr., Maxwell & Crowe (Court-appointed), Dallas, Tex., for Guerra–Marez.

Mark S. Werbner, Dallas, Tex. (Court-appointed), for Maria Paredes–Moya.

Larry Finstrom, Dallas, Tex. (Court-appointed), for Wenseslada Reyes–Moya.

Reed Prospere (Court-appointed), Richard A. Anderson (argued), Dallas, Tex., for Esperanza Adame.

Marvin Collins, U.S. Atty., Dallas, Tex., Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., for U.S.

Before CLARK, Chief Judge, RONEY,[1] and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

The appellants raise several challenges to their convictions for an assortment of narcotics violations. By adopting the arguments of their co-appellants,[2] all appellants contend that wiretap transcripts were erroneously admitted, that the prosecutor improperly exercised his peremptory strikes, and that the indictment was fatally flawed. Appellants Guerra–Marez and Reyes–Moya also contest the sufficiency of the evidence supporting their convictions. Finding only Reyes–Moya's sufficiency challenge meritorious, we affirm in part and reverse in part.

### Facts and District Court Proceedings

As part of a criminal organization rivaling even Ma Barker's, the members of the Moya family participated in large-scale black tar heroin distribution. In the early part of the 1980's, the organization was comprised of two factions, each directed by Paula or Wenseslada Moya, respectively. The sisters' relationship was apparently uneven, and although they once shared a common supplier, they preferred to distance themselves, and their organizations, from each other. In 1985, Paula's career as a drug trafficker ended abruptly; she was arrested on a heroin distribution charge, and sentenced to life in federal prison.

Undaunted, the appellant Maria Paredes–Moya, Paula's sister, assumed Paula's role in the family business. Maria preserved the status quo, choosing to maintain the separate character of Paula's ring. Throughout this time, Maria's primary supplier was the appellant Adam Guerra–Marez, although she occasionally used other suppliers. She used her Dallas home as her primary distribution center, but employed electronic paging devices to contact customers and arrange drug deals. She stored the assorted electronics equipment she occasionally accepted as payment from her customers in a mini warehouse elsewhere.

As time passed, Paula's daughter Norma, then a participant in Maria's ring, grew concerned that her mother might die in prison. To aid her mother, she approached the authorities, and agreed to cooperate in their efforts to crack the Moya rings. Based on information supplied by Norma, federal agents conducted surveillance of several members of the ring, and arranged undercover drug buys with Maria via the electronic pagers. Surveillance was maintained on Maria's residence, and the garbage she deposited at curbside was seized and searched. The government also obtained records of her pager transmissions, and utilized a pen register to monitor calls made by Maria to members of her organization.

---

1. Circuit Judge of the Eleventh Circuit, sitting by designation.

2. Each appellant filed a separate brief, and later requested permission to adopt those arguments advanced by the other appellants that were relevant to his or her posture in the case. Thus, all arguments except the sufficiency of the evidence challenges raised by Reyes–Moya and Guerra–Marez, and the severance argument raised by Guerra–Marez were attributed to all four appellants.

Although these investigative efforts were initially fruitful, the agents suspected that crucial evidence regarding the identity of other participants was eluding them. Accordingly, the DEA applied for and received authorization from the district court to intercept Maria's phone calls. Most of the calls intercepted were from Adam, other members of the network such as Esperanza Adame, or customers attempting to arrange a drug transaction.

While the investigation was ongoing, Adam expressed to Norma his interest in supplying heroin to her aunt, Wenseslada, as well. Anxious to ferret out additional participants in the distribution network, the agents permitted Norma to arrange a meeting between Adam and Wenseslada at the latter's restaurant. When Wenseslada arrived, Adam had already gone, leaving a sample of his heroin with Delia, her sister. Wenseslada rejected the sample due to its low purity, and instructed Delia to deliver it to Norma. The transaction was recorded by Norma, who was equipped with a listening device.

Based on all the evidence collected, the agents procured search and arrest warrants for all the appellants. The search warrants were soon executed, and the appellants were arrested. The search of Maria's residence produced $8,000 in money orders, and a set of scales and gram weights, while a search of the mini-warehouse produced another scale, heroin cutting agents and packaging paraphernalia, handguns, a bill for the pagers, and tax documents belonging to Maria. A search of the automobile Wenseslada was driving when she was apprehended produced a loaded handgun, a portable safe containing $13,500 in cash, and 19 individual packages of heroin. Agents also searched her boyfriend's apartment, and found an extraordinary number of televisions, stereos, and other appliances. In Adam's residence, the agents discovered an electric grinder containing heroin residue, a scale, small quantities of heroin, and heroin cutting agents. Finally, a drug transaction ledger was discovered in the home of Susie Vela, a defendant who is not a party to this appeal.

Based upon that evidence and post-arrest confessions, the appellants and nine others were indicted for 55 violations of federal narcotics laws. Guilty pleas were accepted on the majority of the counts, and the appellants proceeded to trial on the remaining ones. A jury convicted each of the four appellants of conspiracy to possess heroin with the intent to distribute. Adam and Maria were also convicted of heroin distribution, and use of a telephone to facilitate drug trafficking. Wenseslada was convicted of possession of heroin with the intent to distribute, and Esperanza Adame was convicted of the use of a telephone to facilitate a drug offense. From those convictions, the appellants take this appeal.

### The Wiretap Application

Maria argues that the district court erred in refusing to suppress evidence obtained from the wiretaps, contending that the affidavit submitted in support of the application contained fatal errors and misrepresentations. We find no error.

■ Title III of the Omnibus Crime Control and Safe Streets Act of 1968 empowers a federal judge to authorize wire, oral, or electronic communication interceptions upon compliance by law enforcement agents with statutory prerequisites. *See generally* 18 U.S.C. §§ 2510–2521. Recognizing the highly intrusive nature of a wiretap, Congress added section 2518(1)(c), a statutory "necessity requirement" designed to insure that "wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime."[3] *United States v. Web-*

---

**3.** Section 2518(1)(c) provides in part:

(1) Each application for an order authorizing or approving the interception of a wire or oral communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

\* \* \* \* \* \*

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they

*ster*, 734 F.2d 1048, 1055 (5th Cir.), *cert. denied*, 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). However, courts are reluctant to impose their hindsight upon law enforcement agencies, and the proponent of the application need not establish that "every other imaginable mode of investigation would be unsuccessful." *United States v. Diadone*, 558 F.2d 775, 778 (5th Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978). Instead, we take a "common sense view" of the statements contained in the application to determine if the necessity requirement is satisfied. *Id.*

■ Special problems are presented when the affidavit in support of the wiretap application allegedly contains intentional or reckless misrepresentations or falsehoods. The U.S. Supreme Court has recognized that implicit in the fourth amendment's Warrant Clause is the assumption that factual allegations necessary to support a finding of probable cause must be *truthful. Franks v. Delaware*, 438 U.S. 154, 164, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). In the context of a search warrant, the *Franks* court held that once a defendant makes a "substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth," was included in the affidavit, the defendant is entitled to a hearing to contest the validity of the war-

rant. *Id.* at 155–156, 98 S.Ct. at 2676. Any offending statements are then stricken from the affidavit, and the search warrant is validated only if the reconstructed affidavit satisfies the probable cause requirement.

In the context of an allegedly defective wiretap affidavit, the standard for validating the intercept has not yet been defined in our circuit.[4] However, a recent case applying section 2518 by analogy is instructive. In *United States v. Cuevas–Sanchez*, 821 F.2d 248 (5th Cir.1987), the government obtained authorization to conduct video surveillance of the defendant's home, a suspected drug trafficking site. The affidavit contained the false statement that the defendant had previously been arrested for cocaine possession. Although the court recognized that Title III did not specifically address video surveillance, it chose to apply section 2518 "as a guide for the constitutional standard." *Id.* at 251.[5] As to the false statement, the court found that *Franks* was controlling. After excising the erroneous portions, it revisited the probable cause determination, and validated the surveillance warrant.

■ Where, as here, the affidavit falls *squarely* within the dictates of section 2518, application of the *Franks* standard is no less appropriate. Via a motion to suppress, Maria argued that the wiretap affi-

---

reasonably appear to be unlikely to succeed if tried or to be too dangerous ...

4. In other circuits, courts have assumed that the *Franks* standard applied in the Title III context. *See United States v. Page*, 808 F.2d 723, 728 (10th Cir.), *cert. denied*, 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987); *United States v. Cole*, 807 F.2d 262 (1st Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987). We reject the appellants' suggestion that we adopt an arguably diluted *Franks* standard applied by the Ninth Circuit in Title III challenges. In *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir.1985), the court evaluated a reconstructed affidavit to determine if the necessity requirement of section 2518(1)(c) was satisfied. Citing *Franks*, the court concluded that "a reasonable district court judge *could have* denied the application," and affirmed the district court's suppression of the wiretap evidence. *Id.* at 1487 (emphasis added). See also *United States v. Carneiro*, 861 F.2d 1171, 1176–

83 (9th Cir.1988) (applying the same "could have" standard). This court questions whether the Ninth Circuit in *Ippolito* intended to erode the *Franks* standard. *Compare Ippolito*, 774 F.2d at 1487 ("a reasonable district judge *could have* denied the application" (emphasis added)), *with id.* at n. 3 ("the court ... determines whether the issuing court *would still* issue the wiretap order" (emphasis added)). To the extent that case does advocate a diluted *Franks* standard, we decline to adopt it.

5. As a basis for its decision to do so, the court relied on two opinions from other circuits. In both *United States v. Biasucci*, 786 F.2d 504 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986) and *United States v. Torres*, 751 F.2d 875 (7th Cir.1984), *cert. denied*, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985), the courts "borrowed" the requirements of Title III and applied them as a "measure of the government's constitutional obligation." *Biasucci*, 786 F.2d at 510.

davit contained numerous false statements and material misrepresentations. She objected primarily to the government's characterization of the informant Norma as a "fringe participant" not privy to the inner workings of the organization and without access to its principal players. She also objected to the government's suggestion that Norma would refuse to testify, or that her testimony would be subject to damaging impeachment. Finally, she argued that the government misrepresented the success of the traditional investigative techniques it had employed. Applying *Franks*, the district court performed an exhaustive review of the evidence, identified and excised the offensive portions of the affidavit, and validated the warrant. *See United States v. Paredes–Moya*, 722 F.Supp. 1402 (N.D.Tex. 1989). Reviewing that decision *de novo*, *United States v. McConney*, 728 F.2d 1195, 1202–03 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), we uphold the district court's ruling.[6]

As the district court noted, the government could have properly assumed that Norma might not be available to testify at trial. With both her mother and husband in jail, she might have decided at any time that she was unwilling to face the wrath of the Moya clan alone when the extent of her cooperation with the government was revealed. Even if she did testify, the government was aware that Norma's status as a paid informant would subject her to impeachment, and it was entitled to secure evidence to corroborate the testimony of such a pivotal witness.

Although other investigative techniques had been employed, gaps in the government's case were evident. For example, the quantity of heroin obtained through undercover drug buys was too small to prove a large-scale conspiracy. Some members of the ring became conscious of surveillance, frequently eluding the agents or refusing to deal with them. The agents' efforts to identify Maria's suppliers were also frustrated by their inability to obtain

advance warning of major incoming shipments of drugs. Although Norma occasionally witnessed large heroin transactions, such viewings were accidental and uncorroborated. The government could have reasonably concluded that attempting to elicit further information through Norma would have aroused the suspicions of other participants, thus endangering both its informant and the investigation.

In light of this showing, and consistent with our court's ruling that the government need not prove exhaustion of every conceivable option before a wiretap order may issue, we conclude that the reconstructed affidavit satisfied the necessity requirement of section 2518. The district court properly denied Maria's motion to suppress.

*Variance in the Indictment*

■ All appellants challenge their convictions on the ground that a variance between the conspiracy alleged in the indictment and the evidence adduced at trial resulted in prejudicial error. Whether the evidence shows one or multiple conspiracies is a factual question within the purview of the jury. *United States v. Gonzales*, 866 F.2d 781, 787 (5th Cir.), *cert. denied*, 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989). Examining the evidence presented in the light most favorable to the government, our court considers these factors in determining whether a single conspiracy was proven: (1) the existence of a common goal or purpose, (2) the nature of the scheme, and (3) overlapping participants in various dealings. *United States v. De Varona*, 872 F.2d 114, 118 (5th Cir.1989).

■ Even if a variance is found, it does not constitute reversible error "unless it prejudice[s] [the defendant's] substantial rights." *United States v. Richerson*, 833 F.2d 1147, 1154–1155 (5th Cir.1987). To this extent, our court has recognized that "[i]f the government proves multiple conspiracies and a defendant's involvement in

---

**6.** Because the government does not challenge the district court's finding that the affidavit contained false statements, misrepresentations, and omissions, we review only its conclusion that the reconstructed affidavit still satisfied the requirements of Title III.

at least one of them, then clearly there is no variance affecting that defendant's substantial rights." *United States v. L'Hoste*, 609 F.2d 796, 801 (5th Cir.), *cert. denied*, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980).

▪ We are unpersuaded by the government's argument that a single conspiracy was proven at trial. Although evidence that Wenseslada's and Maria's rings dealt in the same goods and occasionally used the same supplier is probative, it does not establish that a single conspiracy existed. Other evidence demonstrated that Wenseslada and Maria's relationship was hostile, and thus they preferred to maintain separate operations. Each retained separate employees, served different customers, and operated out of different locations. Evidence that Maria's supplier, Adam, once tried to convince Wenseslada to purchase heroin from him does little to further the government's position. It is undisputed that Wenseslada refused Adam's offer, preferring instead to rely on her own, separate source.

However, although the appellants correctly assert that a variance exists, they have failed to prove that it affected their "substantial rights." In support of their argument that the variance produced the risk of transference of guilt between the appellants, they rely upon *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We are unpersuaded. In *Kotteakos*, a single indictment charged thirty-two defendants with involvement in a single conspiracy. Although the evidence established as many as eight separate conspiracies, the judge failed to give a precautionary jury instruction regarding transference of guilt. The Supreme Court reversed the convictions, noting that "[g]uilt is not a matter of mass application." *Id.* at 772, 66 S.Ct. at 1252.

The rationale behind the *Kotteakos* decision is inapplicable here. Although several defendants were initially charged in this indictment, only four proceeded to trial. While eight conspiracies were established in *Kotteakos*, only two were proven here. Accordingly, the risk of transference of guilt was minimal. Also unlike the petitioners in *Kotteakos*, these appellants did not contest the validity of the trial judge's careful instructions on the separate character of the two conspiracies.[7] As the *Kotteakos* court recognized, co-conspirators typically "invite mass trial by their conduct." *Id.* A court need only "use ... every safeguard to individualize each defendant in his relation to the mass." *Id.* We conclude that the slight risk of transference of guilt was minimized by the trial judge's instructions, providing adequate safeguards for the rights of the individual defendants.

▪ Adam contends that his conviction for aiding and abetting the distribution of heroin is tainted by yet another alleged variance in the indictment. That conviction arises out of the meeting between Wenseslada, Delia, and Norma at which the heroin sample left by Adam was presented to Wenseslada. Adam argues that while the indictment charged him with aiding and abetting *Wenseslada* in the distribution of heroin, *Delia* was the one who actually distributed the sample to Norma. Accordingly, because he could not aid and abet a party who did not actually distribute the heroin, he claims there was a fatal variance between the crime charged in the indictment and the evidence adduced at trial. We find this technical argument meritless. The record indicates that Delia was Wenseslada's sister and closest confederate. Wenseslada was present when the delivery of the heroin to Norma occurred, and apparently directed Delia to give the heroin to Norma. We cannot conclude that the fact that Wenseslada did not *physically* transfer the drug creates a variance in the indictment.

---

7. The trial judge instructed the jury in part:
 If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit the defendant. In other words, if you find the defendant guilty of the conspiracy offense alleged in count 1, you must find that he or she was a member of the conspiracy alleged in count 1 and not some other, different conspiracy.

■ Equally unavailing is Adam's argument that the disparity between the quantity of heroin charged in the indictment, six grams, and the amount of heroin actually transferred, twenty milligrams, constitutes a fatal variance. Absent a showing that Adam's "substantial rights" were prejudiced, variance between the quantity of drugs alleged in the indictment and the quantity indicated by the evidence does not taint the conviction. *United States v. Sheikh*, 654 F.2d 1057, 1066–67 (5th Cir. 1981), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). The indictment fairly apprised Adam of the charges against him, and provided enough information for him to construct a defense. Because we find no prejudice resulting from the variance, we dismiss this contention.

### Prosecutorial Misconduct

■ The appellants, all Hispanics, argue that the government's use of its peremptory strikes to exclude all three Hispanic members and two black members of the jury venire constitutes a violation of their due process and equal protection rights. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that a defendant who is a member of an identifiable racial group raises a presumption of prejudice when he calls the court's attention to the prosecutor's use of peremptory strikes against members of his race. Once raised, the prosecutor may rebut the presumption by offering race-neutral explanations for the

exercise of the strikes. *Id.* at 97, 106 S.Ct. at 1723.

Giving great deference to the trial judge's assessments,[8] we conclude that the explanations offered by the prosecutor in defense of the strikes were adequate to overcome the *Batson* presumption. The prosecutor noted that two of the stricken Hispanic jurors and the two black jurors had relatives who had drug problems or arrest records. The third Hispanic juror was excused when the prosecutor erroneously attributed criticism about the quality of wiretap recordings to her. At the *Batson* hearing, the prosecutor conceded his error regarding that juror. The trial judge correctly concluded that because the error was inadvertent, no intent should be inferred. We note that the prosecutor's confusion may have worked to the appellant's advantage, since it left on the panel a juror the prosecution intended to strike. We find these reasons sufficient to rebut the *Batson* presumption of prejudice, and reject the appellants' assertion of error.[9]

### Sufficiency of the Evidence
Adam Guerra–Marez

Adam challenges the sufficiency of the evidence supporting his convictions for conspiracy and use of a telephone to facilitate a drug offense. Finding the evidence ample, we uphold the jury's verdict.

■ In reviewing a challenge to the sufficiency of the evidence, this court must determine whether "a rational trier of fact could have found that the evidence estab-

8. In *Batson*, the Supreme Court noted that "since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. *See also, United States v. Roberts*, 913 F.2d 211, 213 (5th Cir.1990).

9. The appellants also allege that the prosecutor's explanations were pretextual, because white jurors "similarly situated" to the excused Hispanic jurors were not challenged. We dismiss this contention. Although this issue is apparently *res novo* in our circuit, others have addressed it with consistent results. *See e.g. United States v. Alston*, 895 F.2d 1362, 1374 (11th Cir.1990) (Hatchett, J. concurring); *United States v.*

*Thompson*, 827 F.2d 1254, 1261 (9th Cir.1987). As the Eleventh Circuit noted, "[w]hen an allegation of pretext is raised, *the defendant* bears the burden of convincing the district court that the proferred reasons are pretextual by introducing evidence of comparability." *Alston*, 895 F.2d at 1374 (emphasis added). Once presented, the district judge must determine if evidence of comparability is sufficiently "concrete." *Id.* In this case, unlike *Thompson*, the appellants were afforded ample opportunity to present persuasive evidence of comparability. The district judge considered their arguments, and apparently found that the appellees had failed to carry their burden in impeaching the prosecutor's explanations. Affording that determination "great deference," *Roberts*, 913 F.2d at 213, we uphold the district court's ruling.

lished guilt beyond a reasonable doubt." *United States v. Carrasco*, 830 F.2d 41, 43 (5th Cir.1987). It is not necessary that the evidence exclude every hypothesis of innocence, and "a jury is free to choose among reasonable constructions of the evidence." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982). We view all inferences and credibility choices in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

■■■ With regard to the conspiracy count, Adam argues that evidence of isolated sales of heroin to Wenseslada or Maria cannot support a conviction for conspiracy. As Adam properly notes, evidence of the substantive offense of distribution will not, without more, support a conspiracy conviction. See *United States v. Onick*, 889 F.2d 1425, 1432 (5th Cir.1989). Instead, in a conspiracy prosecution, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy. *United States v. Magee*, 821 F.2d 234, 238–39 (5th Cir.1987). Proof of any element may be by circumstantial evidence, and "a common purpose and plan may be inferred from the development of 'a collocation of circumstances'." *United States v. Marx*, 635 F.2d 436, 439 (5th Cir.1981) (citations omitted).

■■ A review of the record reveals ample evidence to sustain Adam's conspiracy conviction.[10] Alicia Moya, a co-defendant who plead guilty to similar charges, testified that she went to Adam's apartment to obtain heroin, and that she had accompanied Susie Vela, another guilty plea entrant, to the apartment on other occasions for the same purpose. While there, she saw heroin in his apartment, and observed him grind it in a coffee grinder to prepare it for sale. Norma testified that she overheard telephone conversations between Adam and Maria in which they arranged meetings. She also recalled that Adam admitted to her he regularly supplied heroin to Maria and Robert Moya, another co-defendant, an admission later corroborated by Susie Vela. Construing all inferences in the light most favorable to the government, the evidence supports the jury's conclusion that Adam knowingly agreed to participate with various members of the Moya ring in the distribution of heroin. We uphold the conspiracy conviction.

■■ Similarly, the evidence supporting Adam's conviction for use of a telephone to facilitate a drug trafficking offense is also sufficient. Noting that the word "heroin" was never mentioned in the telephone conversation upon which the charge was based, Adam argues that the government failed to prove the conversation was aimed at facilitating a *heroin* transaction.[11] In so

---

**10.** Adam challenges the admissibility of much of the testimony in the record on the ground that it is hearsay, and thus violates his sixth amendment right of confrontation. We disagree. Under .Federal Rule of Evidence 801(d)(2)(E), a statement which would otherwise be hearsay is admissible against a party if the proponent establishes that (1) a conspiracy existed, (2) the statement was made during the course of and in furtherance of the conspiracy, and (3) the defendant and the declarant were members of the conspiracy. *United States v. Nichols*, 695 F.2d 86, 89 (5th Cir.1982). The existence of the conspiracy must be proven by corroborating evidence independent of that of the alleged co-conspirators. *United States v. Rodriguez*, 689 F.2d 516, 518 (5th Cir.1982). When these requirements are satisfied, the defendant's sixth amendments rights are held invi-

olate because "[c]onstitutional rights are not abridged by the admission of evidence falling within an exception to the hearsay rule." *United States v. Burroughs*, 650 F.2d 595, 597 n. 3 (5th Cir.), *cert. denied*, 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981). The prosecution adequately established the existence of a conspiracy between Adam and various members of Maria's distribution ring. Furthermore, Adam's own statements, the heroin sample delivered to Norma, and the recorded telephone conversations provide independent corroborating evidence of his participation in the conspiracy. The statements of his co-conspirators were properly admitted against him.

**11.** In the conversation, Maria and Adam discussed "a pair of white shoes." Adam initially couched his discussion in terms of "a half" or "a whole" pair, but apparently suspecting that Ma-

doing, Adam misapprehends the meaning of both 21 U.S.C. § 843(b)[12] and *United States v. White,* 569 F.2d 263 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978), the case he cites in support of his argument. There is no statutory requirement that the indictment specify the drug involved in the offense, nor has our court imposed a jurisprudential one.[13] *White* is inapplicable because that case addressed the government's burden in a *conspiracy* prosecution. Unlike cases brought under section 843(b), our court has articulated the rule that in a conspiracy prosecution, "the substance involved in the transaction must be the same illegal substance alleged in the indictment." *Id.* at 268. Because a jury could have reasonably concluded that certain phrases used by Adam and Maria were code words for controlled substances of *any* kind, Adam was properly convicted for the facilitation offense.

### Wenseslada Reyes–Moya

 Wenseslada argues that the evidence was insufficient to support her conviction for conspiracy to distribute heroin. We agree, and set aside that conviction and vacate her sentence.

The government predicates its case against Wenseslada upon her familial ties with Maria, the fact that they once shared a common supplier and dealt in the same commodity, and Wenseslada's willingness to discuss a heroin deal with Adam, Maria's supplier. Even affording this evidence generous review, it is insufficient to prove that Wenseslada knowingly participated in *Maria's* heroin distribution ring. The government's own witnesses testified that Maria and Wenseslada's relationship was strained, and that they intentionally maintained separate operations. In his opening statement, the prosecutor conceded that "the evidence will show that most of the time [Maria and Wenseslada] were not working together, that they had their own customers, their own clientele, [and that they] did not really get along very well...." Although the government dwells on the arranged meeting between Wenseslada and Adam as evidence that the two rings overlapped, we are not persuaded. Wenseslada clearly declined Adam's offer to do business, rejecting the sample and saying, "Take it ... what do I want it for?".

Equally unavailing is the government's argument that the common goal of the two organizations, street distribution of black tar heroin, is sufficient to tie Wenseslada to Maria's conspiracy. In that regard, the government's reliance on *United States v. Winship,* 724 F.2d 1116 (5th Cir.1984) is misplaced. In *Winship,* the court considered the appellants' claim that the evidence established two, rather than one conspiracy. Although their common purpose was considered a *factor,* the court was also

---

ria misunderstood him, he added, "You know ... a small one ... not a whole one ... *one ounce* ..." (emphasis added).

**12.** Section 843(b) provides in part:

It shall be unlawful for any person knowingly or intentionally to use any communications facility in committing or in causing or facilitating a felony under any provision of this subchapter.... For purposes of this subsection, the term "communication facility" ... includes mail, telephone, wire, radio, and other means of communication.

**13.** The appellant urges this court to apply *United States v. Samuels,* 741 F.2d 570 (3d Cir.1984), in which our sibling circuit, in partial reliance upon our holding in *United States v. White,* 569 F.2d 263 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1978), implied that the subject of the communication must be the same as the drug specified in the indictment. Although not bound by this decision, and without addressing our accord with the Third Circuit's reliance on *White,* we find *Samuels* factually distinguishable. In *Samuels,* the indictment charged the defendant with use of a telephone to facilitate the exchange of "heroin for cocaine." However, the government's expert, a DEA agent, testified that the code words used in the recorded conversation referred to heroin and *marijuana.* In this case, the expert testified that "white shoes" was not a commonly known slang term for any particular drug. Thus, unlike in *Samuels,* this jury was free to draw the reasonable inference that "white shoes" referred to heroin. *Cf. United States v. Briscoe,* 896 F.2d 1476, 1511 (7th Cir.1990) (where the court held that "[t]he absence of a specific reference to the name of the drug in question does not prevent a rational trier of fact from inferring that the conversation concerned the drug in question.")

persuaded by the significant overlap in the membership of the two organizations, a factor absent in this case. *See also De Varona,* 872 F.2d at 118. Although the evidence tends to support a conclusion that Wenseslada was involved in *some* conspiracy, it does not prove her involvement in *Maria's* conspiracy. Accordingly, we set aside Wenseslada's conspiracy conviction.

### The Severance Motion

■ Adam argues that the district court erred in not granting his motion for severance, contending that he was prejudiced by the volume of evidence presented against the Moya family defendants. We disagree.

Adam was properly charged in the indictment as a co-conspirator, thus all evidence dealing with any member of the conspiracy was admissible against him as well. He did not present any defense that was irreconcilable with those of his co-defendants, and was protected from transference of guilt by the trial judge's limiting instructions. *See Winship,* 724 F.2d at 1123. Accordingly, because Adam has failed to show compelling prejudice, *United States v. Rocha,* 916 F.2d 219, 227–232 (5th Cir. 1990), we uphold the district court's denial of the severance motion.

### Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED in part, and REVERSED in part. The sentence of Wenseslada Reyes–Moya is VACATED and the matter is REMANDED to the district court for her resentencing.