# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 19, 2010

No. 08-10057
Summary Calendar

Charles R. Fulbruge III
Clerk

CECIL KEITH HAYES,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:05-CV-01974

Before KING, STEWART, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:[*]

In this habeas case, Cecil Keith Hayes ("Hayes") challenges his state-court conviction following a jury trial before a jury selected in a process he contends was tainted by *Batson*[1] violations. The district court granted a Certificate of Appealability (COA) on this question with respect to the prosecution's striking

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

No. 08-10057

of Juror #15, Cynthia Richard. We granted a COA on the same question as to Juror #16, Linda Jackson. Our review is limited to these questions under the applicable AEDPA[2] deferential review standards. For the reasons set forth below, we REVERSE and REMAND with instructions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2002, Hayes was tried in a Dallas County state district court on the charge of aggravated robbery. During the jury selection process, Hayes objected to the prosecution's use of eight of its eleven peremptory strikes to remove all eligible African-American venire members from the panel that was ultimately seated. Following a *Batson* hearing, the trial court judge sustained the *Batson* challenge regarding the striking of one potential juror, Juror #6, Gertrude Hashaway, but overruled it as to the remaining jurors, including the two in question here, Richard and Jackson.

With respect to Hashaway, the prosecutor contended that she was sleeping during voir dire and was "grandmotherly and careless in her appearance." The trial court concluded that she was not sleeping and that being "grandmotherly" and careless in one's appearance was not a "proper reason" for a peremptory strike. She was then reinstated to the jury.

With respect to Richard, the prosecution claimed that she was struck for five different reasons: (1) she was "hostile"; (2) she failed to respond to the judge's questions; (3) she had a "bad juror rating"; (4) she was employed as a teacher; and (5) she selected "rehabilitation" as an important goal of the criminal justice system. During the *Batson* hearing, the trial judge dismissed the assertion that Richard was non-responsive and focused on the "hostility" prong. The trial judge concluded that, while he noticed no such hostility, hostility is a legitimate reason for striking a juror. Notably, the prosecution did not strike

---

[2] Anti-Terrorism and Effective Death Penalty Act § 104, 28 U.S.C. §2254 (2006).

No. 08-10057

two people who were white teachers and served as jurors nor did it strike a white juror who also had a "bad juror rating"; additionally, Richard actually did not mention rehabilitation as a goal of the criminal justice system.

With respect to Jackson, the prosecution claimed that she was struck for three reasons: (1) she had a cousin with a pending criminal case in the same county; (2) she allegedly gave conflicting answers about whether she would need to see the gun that was used in the robbery; and (3) she chose rehabilitation as a goal of the criminal justice system. In response, the defense noted that other individuals were selected for the jury who also had relatives with criminal cases and who chose rehabilitation as a goal of the criminal justice system. The defense also pointed out that Jackson's seeming "conflicting answers" about the gun actually reflected confusion about the original question; once clarified, she indicated she did not need to see the gun.

Following his conviction, Hayes appealed the denial of his objections to the state's intermediate court of appeals, as well as the Texas Court of Criminal Appeals. Both affirmed. *Hayes v. State*, No. 11-02-00348-CR, 2003 WL 22064066 (Tex. App. – Eastland Sept. 4, 2003) (unpublished), *aff'd*, No. PD-16556-03 (Tex. Crim. App. March 3, 2004) (unpublished). The record does not indicate that a petition for writ of certiorari was filed in the United States Supreme Court.

Having thus exhausted his state court appeals, Hayes sought a writ of habeas corpus from the United States District Court. The magistrate judge conducted two hearings and first recommended denial of habeas relief before subsequently recommending granting habeas relief with respect to the strike of Richard. After hearing oral argument, the district judge concluded that relief should not be granted and denied Hayes's petition. Both judges expressed concern about the fact that 100% of the African-American venire members were struck by the State and opined that this was a difficult case. This appeal followed.

3

No. 08-10057

## II.  STANDARD OF REVIEW

Our standard of review in an AEDPA case is well-established: deference must be given to factual findings of the state court in the absence of clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1).  Because the *Batson* claims were adjudicated in state court, the district court, as well as our court, must defer to the state court's resolution unless its determination was "contrary to" or an "unreasonable application of" clearly established federal law as determined by the United States Supreme Court.  § 2254(d); *see also Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  A state court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams v. Taylor*, 529 U.S. 362, 405 (2000), or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." *Id.* at 406.  A state court decision involves an unreasonable application of clearly established federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . ." *Id.* at 407-08.  The Supreme Court has articulated the governing standards for evaluating whether peremptory strikes were race-based in several cases, including *Batson* and *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231 (2005).  The most recent Supreme Court pronouncement on this subject was *Snyder v. Louisiana*, 128 S. Ct. 1203 (2008).

While AEDPA review is highly deferential, we note that it is not perfunctory.  The Supreme Court has stressed that "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340 (2003); *see also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (AEDPA does not "prohibit a federal court from finding an

4

No. 08-10057

application of a principle unreasonable when it involves a set of facts different from those of the case in which a principle is announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.") (internal quotation marks and citation omitted); *Taylor*, 529 U.S. at 377 (AEDPA "directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law.").

Mindful of these precedents, our court addressed the application of *Batson* in a § 2254 proceeding in *Reed v. Quarterman,* 555 F.3d 364 (5th Cir. 2009) and *Haynes v. Quarterman*, 561 F.3d 535 (5th Cir. 2009). These cases further inform our analysis.

## III. DISCUSSION

### A. Standards for a Batson Inquiry

The Equal Protection Clause forbids a prosecutor from challenging potential jurors solely on account of their race. *Batson*, 476 U.S. at 89. *Batson* outlined a three-step process for evaluating claims that a prosecutor used peremptory challenges in a manner that violated the Equal Protection Clause: (1) a defendant must make a prima facie showing that the prosecutor has exercised his peremptory challenges on the basis of race; (2) the burden then shifts to the prosecutor to articulate a race-neutral reason for striking the juror in question; and (3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Snyder,* 128 S. Ct. at 1207.

The Supreme Court explained the third step in the following manner:

Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness,

5

inattention), making the trial court's first-hand observations of even greater importance.

*Id.* at 1208 (internal quotation marks and citations omitted). The ultimate conclusion of discriminatory intent is a factual finding. *Ladd v. Cockrell*, 311 F.3d 349, 356 (5th Cir. 2002). "[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike. At this stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Miller-El I*, 537 U.S. at 338-39 (internal quotation marks and citation omitted). "[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based." *United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993). The "decisions of this court have made it plain that the process of choosing a jury may be influenced by the 'intuitive assumptions' of the attorneys." *Id.* at 1374. "We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province, and we have stated that in the absence of exceptional circumstances, we would defer to [the trial court]." *Snyder*, 128 S. Ct. at 1208 (internal quotation marks and citations omitted). When reviewing a *Batson* ruling, because "all of the circumstances that bear upon the issue of racial animosity must be consulted," this court may consider the strike of one juror for any relevance it might have regarding the strike of another juror. *Id.*

Our review is further informed by various post-*Batson* Supreme Court decisions. In *Miller-El II*, a Texas defendant sought federal habeas corpus relief on the ground that the trial court should have sustained his objection to the prosecutor's discriminatory use of peremptory strikes against African-American jurors. 545 U.S. at 236-37. The Supreme Court conducted "side-by-side

comparisons of some black venire panelists who were struck and white panelists allowed to serve." *Id.* at 241. The Court noted that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.* The *Miller-El II* majority rejected the dissent's assertion that "'similarly situated' does not mean matching any one of several reasons the prosecution gave for striking a potential juror-it means matching *all* of them." *Id.* at 247 n.6. The majority stated:

> None of our cases announces [sic] a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. . . . A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.

*Id.*

The Court then considered two specific African-American jurors who had been struck by the prosecution: Billy Jean Fields and Joe Warren. *Id.* at 242-52. The prosecutor's proffered reason for striking Fields was that he had concerns with Fields's statements indicating that he could not impose the death penalty because the defendant could possibly be rehabilitated. *Id.* at 243. After that strike was challenged by defense counsel, the prosecutor added that Fields was struck because his brother had a prior conviction. *Id.* at 246. The Court noted that the prosecutor mischaracterized Fields's statements and that the prosecutor accepted several non-African-American venire members who expressed reservations about imposing the death penalty on a person who could be rehabilitated. *Id.* at 244-45. The Court discredited the prosecutor's secondary basis for the strike because it "reek[ed] of afterthought," as Fields stated that he was not close to his brother, and the prosecutor did not ask whether his brother's criminal history would influence him if he were to serve as a juror. *Id.* at 246.

No. 08-10057

The prosecutor in *Miller-El II* provided three reasons for striking Joe Warren: (1) Warren provided inconsistent responses and implied that the death penalty may be a more lenient punishment than imprisonment for life; (2) Warren was struck when the State still had ten peremptory challenges left and could afford to be more liberal in striking potential jurors; and (3) Warren had a brother-in-law who had been convicted of a crime involving food stamps. *Id.* at 248-52. The Court noted that three unstruck venire members expressed similar opinions regarding the death penalty being more lenient than life imprisonment and that one of those unstruck members was accepted before Warren was struck, thereby obviating the prosecutor's second proffered reason. *Id.* at 248-49. As for the third justification, the Court held that the prosecutor's failure to ask any questions about Warren's brother-in-law undermined the validity of that reason. *Id.* at 250 n.8. The Court further noted that other unstruck panel members also had relatives who had criminal histories. *Id.* In light of these comparisons, the Court found the prosecutor's race-neutral reasons to be implausible, thereby supporting the defendant's *Batson* challenge. *Id.* at 247, 251-52. However, the Court's ultimate conclusion that a *Batson* violation had occurred was also supported by the Court's determinations that (1) the prosecutor engaged in purposeful discrimination by shuffling the jury panel[3] and posing contrasting questions to the jurors regarding minimum sentences and (2)

---

[3] Texas has a unique procedure allowing attorneys to "view the array" and then request that the venire be "shuffled." Enacted at a time when questions could be raised as to the randomness of the venire panel's assembly, its continued use has been questioned in light of *Batson* and modern selection processes. *See* Michael Gallagher, *Abolishing the Texas Jury Shuffle*, 35 ST. MARY'S L. J. 303 (2004); Elaine Carlson, Batson*, J.E.B., and Beyond: The Paradoxical Quest for Reasoned Peremptory Strikes in the Jury Selection Process*, 46 BAYLOR L. REV. 947, 981-82 (1994). There is no indication that such a shuffle played a part in this case.

No. 08-10057

the Dallas County District Attorney's office manual[4] advocating the exclusion of minorities from jury service had been made available to at least one of the prosecutors in Miller-El's trial. *Id.* at 253-66.

In *Snyder*, a Louisiana defendant argued on appeal that the trial judge erred in rejecting his objection to the prosecutor's discriminatory use of peremptory strikes against African-American jurors. 128 S. Ct. at 1207. Although the defendant's *Batson* claim centered on two African-American venire members, the Supreme Court upheld the claim as to one, Jeffrey Brooks, and therefore found it unnecessary to consider the claim as to the other African-American panelist. *Id.* at 1208. The prosecutor in *Snyder* provided two reasons for striking Brooks: (1) he looked very nervous throughout the questioning; and (2) he was a student teacher who expressed concern about missing class and the prosecutor was worried that Brooks might vote for the defendant's guilt on a lesser verdict in order to avoid a penalty phase. *Id.*

The Court noted that, although deference is due to a trial judge's finding regarding a panelist's demeanor, the trial judge did not make any explicit determination as to Brooks's demeanor and simply overruled the *Batson* objection without explanation. *Id.* at 1209. It therefore held that "we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous." *Id.* The Court held that the prosecutor's second proffered reason for striking Brooks was implausible because (1) Brooks was one of more than fifty venire members (many of whom were accepted as jurors by the prosecution) who expressed concern that jury service could interfere with their other

---

[4] No evidence was presented in Hayes's case that the now-notorious Sparling Manual continued to be in use at the time of his 2002 trial, by which time a new District Attorney was in place in Dallas County. *See Fields v. Thaler*, 588 F.3d 270, 281 (5th Cir. 2009) (noting with regard to another trial in 2002 that "long after the trials of Miller-el and Reed in 1986 and 1983, respectively. . . . There is no evidence that the now infamous Sparling Manual, outlining the reasoning for excluding minorities from jury service, was still in use by Dallas County prosecutors when [defendant's] case was tried.")

obligations, (2) the prosecutor's outlined scenario was highly speculative, and (3) Brooks's concern regarding his teaching requirements was resolved by the trial judge during voir dire. *Id.* at 1209-12. The Court held that "[t]he prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent." *Id.* at 1212. The Court held that the prosecution would only be able to salvage the strike against Brooks by showing that the pretextual factor was not determinative, but that, in light of the circumstances at issue in that case, "the record does not show that the prosecution would have preemptively challenged Mr. Brooks based on his nervousness alone." *Id.* Accordingly, the *Snyder* Court upheld the defendant's *Batson* challenge and vacated the Louisiana Supreme Court's judgment. *Id.*

In *Reed*, we recently granted federal habeas relief in a case that was very similar to *Miller-El II*. Reed argued that the State's race-neutral reasons for excluding African-American jurors were pretextual because the State had accepted many white jurors who had the same characteristics as the excluded African-American jurors. *Reed*, 555 F.3d at 368. We first concluded that, based upon Texas case law, Reed's comparative analysis argument was not procedurally barred in the Texas Court of Criminal Appeals and, hence, was subject to review by this court. *Id.* at 369-71. We then decided that, even though a comparative analysis argument had not been considered by the state courts, it could be considered in a federal habeas proceeding. *Id.* at 371-75. This court supported its conclusion by reviewing the procedural history of *Miller-El II*. *Id.* at 370-75.

The *Reed* court stated that we had recently agreed that *Miller-El II* requires us to consider a comparative analysis in a *Batson* claim. *Id.* at 373 (citing *United States v. Brown*, 553 F.3d 768, 797 (5th Cir. 2008) (direct appeal)); *cf. United States v. Guerra-Marez*, 928 F.2d 665, 673 n.9 (5th Cir. 1991) (when considering an allegation of pretext, defendant must convince the district court

that the prosecution's proffered reasons are pretextual by introducing "evidence of comparability"). Specifically, the *Reed* court noted that the *Brown* court determined "there [was] some indication that both the prosecution and the court failed to take the comparative features of two venire members into account," and it concluded, after comparing those two members, that, under *Miller-El II*, a further explanation from the prosecution for the dismissal of the excluded juror was necessary. *Id.* at 373-74. The *Reed* court ultimately concluded, after considering, among other things, Reed's comparative juror analysis, that Reed was entitled to habeas relief with respect to his *Batson* claim. *Id.* at 375-82. This court therefore reversed the district court's decision denying relief and remanded the case to the district court with instructions to grant the writ. *Id.* at 382.

When reviewing a *Batson* ruling regarding purposeful discrimination, the Supreme Court has initially considered statistical evidence when considering whether the prosecution used its peremptory strikes in a discriminatory manner. *See Miller-El I*, 537 U.S. at 342; *Miller-El II*, 545 U.S. at 240-41. In *Miller-El I*, prosecutors used ten of their fourteen peremptory strikes against African-American venire members, thereby excluding ninety-one percent of the eligible African-American venire members. *Miller-El I*, 537 U.S. at 342. The Court concluded that "[h]appenstance is unlikely to produce this disparity." *Id.* In the instant case, the prosecutor used eight of his eleven peremptory strikes against African-American venire members, thereby excluding 100% of the eligible African-American venire members. While we agree with the district and magistrate judges that this fact alone is not dispositive, *see Fields*, 588 F.3d at 281, it is unlikely to be the product of happenstance and is indicative of discriminatory intent. *Miller-El I*, 537 U.S. at 342.

"More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists

allowed to serve." *Miller-El II*, 545 U.S at 241. "[W]e are also cognizant that the Supreme Court has made plain that appellate review of alleged *Batson* errors is not a hollow act." *United States v. Williamson*, 533 F.3d 269, 274 (5th Cir. 2008) (addressing a *Batson* challenge on direct criminal appeal). Sometimes the reasons given for striking jurors are "race-neutral" when "[v]iewed in isolation." *Id.* at 275. "However, the explanation[s] [may] falter[] upon closer examination." *Id.* In order to engage in the appropriate analysis, we will examine both jurors and then compare them to other non-African-American jurors who were not struck.

B. *Prospective Juror Jackson*

After Hayes objected that all eligible African-American venire members were struck in a discriminatory manner in violation of *Batson*, the prosecutor proffered numerous "race-neutral" explanations. With respect to Juror # 16 Jackson, the prosecutor asserted the following explanations: (1) Jackson gave inconsistent answers to questions regarding whether she would require the State to introduce a firearm into evidence to convict Hayes, thus indicating she might hold the State to a higher burden of proof; (2) Jackson stated that a primary goal of the criminal justice system was rehabilitation; and (3) at the time of the trial, Jackson had a cousin who was out on bond in a pending criminal case in Dallas County, Texas. Hayes's defense counsel responded that the State's reasons for striking Jackson were pretextual. He argued that the State used hypothetical questions regarding the need to see a weapon as a cover for impermissibly striking jurors by presenting a slanted one-sided explanation of the weapon requirement without fully exploring it. The prosecutor argued that she presented the questions fairly; that all of the jurors who gave inconsistent answers regarding the firearm were struck; that punishment was the major focus in this case; and that those jurors who responded that punishment and rehabilitation were important were not struck because the

State had only ten strikes and that was all the State had to justify striking those jurors. The state trial court overruled Hayes's objection as to Jackson, finding that Jackson gave inconsistent answers regarding whether she would require the State to introduce a firearm into evidence to convict Hayes.

In the federal district court, Hayes focused on a comparative analysis of the pool. He argued that non-African-American Juror #5 Newsome, who was not struck by the prosecution, also gave inconsistent answers concerning the need to introduce a firearm to convict. Hayes argued that several non-African-American jurors, who were not struck, stated that rehabilitation was one of the important goals of the criminal justice system (Stanton #7, Stevens #18, Fain #25, Sapp #27, Olivares #28, Ryan #41, Doyle #42, Crump #44, and Noble #45). Hayes also argued that several non-African-American jurors, who were not struck, had relatives who had been prosecuted for crimes and had stated that they believed that their relatives had received excessive sentences (Keeble #29, Artieschoufsky #40, Ryan #41), whereas Jackson stated that her cousin had been treated fairly by the criminal justice system.

The district court rejected these arguments and found that the reasons the State gave for striking Jackson were distinguishable from the characteristics of the seated jurors. Specifically, the district court determined that the State struck Jackson in part because she had a cousin who had pending criminal charges in Dallas County, and none of the seated jurors had a relative with pending criminal charges in Dallas County. The district court determined that the record indicated that Jackson did give inconsistent answers when asked if she would require the State to introduce a firearm in order to convict Hayes. The district court also determined that Jackson was distinguishable from Juror # 5 Newsome because, in the district court's view, Jackson gave arguably inconsistent answers concerning the need to produce a firearm even after the law was explained. The district court did not address the prosecutor's third

13

reason for striking Jackson, her statement that rehabilitation was an important goal of the criminal justice system.

We disagree with the conclusions of the district court. Hayes has shown that the State's reasons for striking Jackson were implausible or invalid and, therefore, were pretexts for discrimination. First, regarding the alleged inconsistency, Jackson initially stated that she thought the State should produce a firearm in order to convict Hayes. After the trial court explained the law to the jury, the State did not question Jackson further concerning introduction of the firearm. In response to defense counsel's questions, Jackson at first stated that she would need to see the firearm if she did not believe the eyewitness; she then stated that the State need not produce a firearm if she believed the eyewitness testimony. Accordingly, Hayes has shown that Jackson's answers to the questions were not inconsistent[5] and that she ultimately answered that the State would not need to produce a firearm if it presented credible eyewitness testimony.[6] Moreover, the prosecutor attempted to challenge Jackson for cause

---

[5]    It should be noted that the federal district court may have confused Juror #16 Jackson with Juror # 46, whose last name was also Jackson. After the trial court explained the law, the State questioned Juror #46 Jackson concerning the need to produce the firearm; even after the law was explained, Juror #46 Jackson stated to the prosecutor that she "would want to see the gun" and "I would require it."

[6] During the prosecution's questioning about the gun, Jackson (#16) responded:

Q: Ms. Jackson, okay, you want that gun, you're going to require the State to bring that gun in?

A: If the State says that it was used, I'd like to see it.

Q: Sure you'd like it. And that's the thing, it's definitely – as a juror, there's all kinds of things you'd like to get. You know, I'd like to know why, I'd like to understand, I'd like to see the gun, I'd like to see the bloody shirt, I'd like to see that knife. You know, that would make, you know, your job a lot easier, but – and I understand that, but you understand that the State is not required to bring that in. And that's okay. There's all kind of – you know, there are people that say, "I'm sorry, I just absolutely have to have it." That's okay if you feel that way. You feel that way, Ms. Jackson, Juror No. 16?

on precisely these grounds before using a peremptory strike and the trial court ruled that Jackson remained qualified for the jury due to the fact that she affirmatively stated she would accept testimony in lieu of physical evidence. As

---

A: (Nods head affirmatively.)

Thereafter, the judge interjected that the law should be explained to the jury and proceeded to explain that the element of a firearm being used could be proved in various ways "but it's not necessary that they actually bring a physical firearm into the courtroom and show it to you. They can do that by evidence, description, if a person is familiar with handguns or whatever, . . . ."

The prosecutor did not thereafter question Jackson, but the defense did so yielding this discussion:

Q: Well, yeah, the question is, when that witness testifies and they – you know, if they convince you that they saw a pistol and there was a pistol, would you still have to see the pistol?

A: I would want to.

Q: Well, sure. Really, we'd all like to have a video of it, so then we'd know – so then we'd know because we could see it, you know. Then we wouldn't have to guess. But there isn't one. But – and – I mean, really, see the question? Do you believe the witness and does that prove the case beyond a reasonable doubt? Do you believe her or him when they say they saw a pistol? If you do, then you don't need to see the pistol.

A: Well, yeah, that's right I would need to see the pistol.

Q: You would need to?

A: If I didn't believe that person.

Q: Of course, if you don't believe the person, they haven't proved their case beyond a reasonable doubt.

A: Right.

Q: So you could get along without the pistol if you were convinced a pistol was used?

A: I guess.

Q: Well, you can't guess.

A: Okay. Yes, if he were believable, yes.

15

such, any misperception that Jackson was inconsistent was put to rest by the trial court well before the prosecutor advanced inconsistency as the justification for the State's strike. Nonetheless, even if the "inconsistency" justification was plausible notwithstanding all of the above, Hayes correctly notes that the trial court failed to follow the Supreme Court's clearly established *Batson* protocol. The required comparative analysis would have demonstrated that non-African American Juror Newsome also gave inconsistent answers to the same series of questions. In short, a proper application of *Miller El II* in the broader context of this voir dire would have required Jackson's reinstatement.

Second, the prosecutor's "pending charges" justification similarly lacks credibility, and the trial court's contrary conclusion runs afoul of clearly established federal law under the required comparative framework. Although Jackson had a cousin with pending criminal charges, she also stated that she believed her cousin was being treated fairly in the criminal justice system. Moreover, Jackson stated that her cousin's pending case would not affect her jury service. Although no other jurors had family members or friends with pending criminal cases, numerous jurors had family members or friends who had criminal convictions. As Hayes pointed out, some of these non-African-American potential jurors had relatives that the potential jurors believed were treated unfairly by the system or received harsh sentences (Keeble #29, Artieschoufsky #40, and Ryan #41). While the district court divorced the question of pendency from the question of fairness/severity, we find that these two concerns are inextricably intertwined because the quality of each juror's prior experience directly informs the credibility of using that experience as a justification to strike. Viewed in that way, the decision to strike Jackson, with her favorable view of the justice system, rather than Keeble, Artieschoufsky, or Ryan, who had personal objections to that same system, cannot be justified under comparative

analysis.  Again, properly applying *Miller El II*, the trial court had clear Supreme Court guidance mandating Jackson's reinstatement.

Hayes has thus shown that the reasons given by the State for striking Jackson also applied to non-African-American jurors who were not struck.  In particular, Juror # 5 Newsome, a non-African-American prospective juror, gave inconsistent answers concerning the need to see a firearm to convict.  Numerous non-African-American jurors, who were not struck, stated that rehabilitation was a primary goal of the criminal justice system. (Stanton #7, Stevens #18, Fain #25, Sapp #27, Olivares #28, Ryan #41, Doyle #42, Crump #44, and Noble #45).  Several non-African-American jurors, who were not struck, had relatives who had been prosecuted for crimes. (Keeble #29, Artieschoufsky #40, Ryan #41).  When these non-African-Americans were questioned further concerning their relatives with criminal convictions, they stated that they believed their relatives received harsh sentences. (Keeble #29, Artieschoufsky #40, Ryan #41).  Juror # 41 Ryan was ultimately chosen to serve on the jury.  In view of these comparisons, Hayes has  shown that the state trial court unreasonably applied clearly established federal law in examining the prosecutor's reasons for striking Jackson.  *See Miller-El II*, 545 U.S. at 247, 251-52.

C.  *Prospective Juror Richard*

With respect to Juror # 15 Cynthia Richard, the district court erred in deferring to the state court's decision to a greater degree than directed by *Miller-El* and *Snyder*.  The district court stated that "based on all of the circumstances, a trial court could have found that the prosecutor lacked credibility in her explanation of why she struck Richard.  However, the Court does not agree that the trial court was obliged to so find."  The district court's analysis is inconsistent with the analysis in *Miller-El II*, *Snyder*, and *Reed* in its approach to reviewing the state court's determination in those cases.

No. 08-10057

The prosecutor advanced three allegedly race-neutral subjective explanations for striking Richard: (1) she was "hostile," (2) she failed to respond to the judge's questions[7]; and she had a "bad juror rating." The prosecutor also offered two "objective" justifications: (1) Richard was employed as a teacher and (2) she selected "rehabilitation" as an important goal of the criminal justice system. The "objective" factors are quickly dispatched: two white jurors were teachers and served on the jury; other persons who selected rehabilitation served on the jury and, notably, Richard did not in fact select the "rehabilitation" option.[8]

The state trial judge also did not appear to credit these reasons but, instead, focused on the "hostility" prong.[9] While *Snyder* requires deference to a state trial court's finding of credibility, the state trial judge here did not expressly find that the explanation was truthful. *See Snyder*, 128 S. Ct. at 1209. Instead, the trial court focused on the concept that hostility is a valid basis for

---

[7] The state trial judge rejected this reason stating, "The few questions I had dealt with the qualifications of the jurors, and just general questions that was [sic] directed to the entire panel as to whether or not they could accept certain propositions of the law."

[8] Appellee makes much of the fact that Hayes has supplemented the record to include the juror cards from the trial and a juror rating form to assist the comparative analysis. Appellee claims we are barred from considering this information as it was not presented to the state appellate courts. This argument is without merit. We have held that we will consider additional information where evidence presented supplements but does not fundamentally alter the claim presented to the state courts. *Anderson v. Johnson*, 338 F.3d 382, 386-87 (5th Cir. 2003). Hayes has consistently argued that the prosecutor offered pretextual justifications for striking the African-American jurors. In providing the juror cards and printouts, Hayes merely added evidentiary support to the claim he has raised in every court to address his case. *Id.* at 387-88 (holding that presenting a habeas claim in a "stronger evidentiary posture" does not trigger an exhaustion dismissal where the petitioner does not seek to advance "a ground [for relief] that is entirely independent of the grounds presented in the state courts." (internal quotation marks and citations omitted)). Furthermore, these juror cards are not case dispositive.

[9] The state trial judge also discounted the "bad juror rating" justification. Hayes notes that another non-African-American prospective juror, Deborah Noble, had a "bad juror rating" but sat as an alternate.

striking a juror. But the state trial judge stated that he observed no such hostility from Richard. More importantly, he never made any finding regarding whether "hostility" was the prosecutor's true motive. Taken against the trial court's statements with respect to both Juror Hashaway and Juror Jackson, it appears that the trial judge's analysis was based upon whether the proffered explanation was a "valid" reason to strike a juror peremptorily, not on whether the reason given was "true" or, more pointedly, whether the prosecutor was telling the truth. In this respect, then, the state trial judge unreasonably failed to apply clearly established law to the facts by failing to examine not just the validity of the reason but the credibility of the prosecutor.[10] This is particularly a problem because neither the judge nor defense counsel observed this supposed hostility. Thus, while it is true that hostility towards a lawyer could be a valid race-neutral reason to strike a prospective juror, we have no clear answer to the question of whether Richard was actually hostile. The answers to the voir dire questions evince no hostility. The judge saw none. The judge did not affirmatively find the prosecutor's testimony credible, only the reason given to be one that, if true, is a valid reason to strike. This case is thus similar to *Snyder* where no finding as to demeanor was made, and the United States Supreme Court found no deference could thus be given. 128 S. Ct. at 1209. Accordingly, the state court's failure to overrule the strike of Richard represents an unreasonable application of clearly established law to the facts.

## IV. CONCLUSION

---

[10] Any sense that the state trial judge implicitly found the prosecutor to be generally credible and free from race-based bias is undermined by the sustaining of the *Batson* challenge as to Hashaway. It is inconsistent to say the prosecutor is always credible about motivations and yet say that the prosecutor was not credible as to the motive in striking Hashaway. Additionally, the trial judge discounted other proffered reasons as to Richard, such as her alleged non-responsiveness to his questions.

No. 08-10057

The district court correctly noted the highly deferential AEDPA review standard for this case.  However, as numerous cases from the Supreme Court and our court have made clear, the deference is not unlimited.  Where, as here, the state court unreasonably applied Supreme Court precedent to the facts, the federal courts must act to correct the error.  Therefore, we REVERSE and REMAND with instructions to grant the writ, set aside Hayes's conviction and sentence, and order Hayes's release from custody unless the State grants Hayes a new trial within a reasonable time to be set as a date certain by the federal district court in its order on remand.

REVERSED and REMANDED with instructions.