## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-70012

United States Court of Appeals
Fifth Circuit

**FILED**

April 27, 2017

Lyle W. Cayce
Clerk

LISA JO CHAMBERLIN,

Petitioner - Appellee

v.

MARSHALL L. FISHER, COMMISSIONER, MISSISSIPPI DEPARTMENT
OF CORRECTIONS,

Respondent - Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before DAVIS, CLEMENT, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

A Mississippi jury convicted Lisa Jo Chamberlin of two counts of capital murder and sentenced her to death. The district court granted Chamberlin's petition for writ of habeas corpus on the ground that the state court erred in finding that there was no racial exclusion of jurors at her trial. We affirm.

**I.**

Even by the standards of capital cases, the double murder in this case was gruesome. It occurred in Hattiesburg, Mississippi, where Chamberlin and her then boyfriend, Roger Gillett, had recently moved in with Gillett's cousin,

No. 15-70012

Vernon Hulett, and Hulett's girlfriend, Linda Heintzelman. After an argument, Hulett and Heintzelman told Chamberlin and Gillett to move out. Unwilling to leave, Gillett began beating Hulett and Heintzelman and demanded that Hulett tell him the combination to a safe in Hulett's bedroom. Although Hulett eventually disclosed a combination, no one was able to open the safe. In an escalating rage, Gillett continued to physically assault Hulett, and he and Chamberlin physically and sexually assaulted Heintzelman.

Eventually, Chamberlin told Gillett they should murder Hulett and Heintzelman and flee. Gillett struck Hulett in the head with a hammer and slashed his throat. Chamberlin attempted to strangle Heintzelman but was not strong enough to suffocate her, so Gillett stabbed Heintzelman. Chamberlin and Gillett left the home to dispose of the knife and hammer. When they returned, Heintzelman was lying on the floor, still breathing. After leaving her there for most of the day, the couple finally decided to suffocate her. They bound her hands with duct tape and put plastic bags over her head until she stopped breathing.

The couple put both bodies in Hulett's freezer, and, taking with them the freezer and all the evidence they could collect, they left Mississippi. They ended up in Kansas, where Gillett had family. Almost immediately, Kansas authorities took them into custody on drug charges and obtained a search warrant for a farm where authorities suspected the couple was manufacturing crystal meth. During the search, sheriff's deputies found the bodies in the freezer.

Back in Mississippi, Gillett and Chamberlin were tried separately. Both trials resulted in death sentences, though Gillett's sentence was vacated on state postconviction review.

2

No. 15-70012

## II.

Even for the most horrific of crimes with the most culpable of defendants, there are certain trial errors that are deemed structural and require automatic reversal. *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). The ground on which the district court granted Chamberlin relief, exclusion of jurors on racial grounds, is one example. "Discrimination in jury selection . . . causes harms to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994). Going all the way back to one of its first cases finding a violation of the Equal Protection Clause (*Strauder v. West Virginia*, 100 U.S. 303, 312 (1880)), the Supreme Court thus "has followed an automatic reversal rule once a violation of equal protection in the selection of jurors has been proven." *Winston v. Boatwright*, 649 F.3d 618, 627 (7th Cir. 2011); *see also Scott v. Hubert*, 610 F. App'x. 433, 434 (5th Cir. 2015) ("[D]iscrimination on the basis of race in the selection of . . . jurors is a form of structural error that voids a conviction.").[1] And because such error "casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt," a defendant may challenge the exclusion of jurors of a different race. *Powers v. Ohio*, 499 U.S. 400, 406–11 (1991) (internal citations omitted).

Chamberlin, a white defendant, invokes that rule to challenge the exclusion of black jurors. After the trial judge narrowed an initial pool of several hundred prospective jurors to 42 qualified jurors, 31% of whom were black, both sides exercised peremptory strikes. The prosecutor first went

---

[1] The Supreme Court recently held that the Ninth Circuit erred by failing to give appropriate deference when applying harmless error analysis on collateral review. *Davis v. Ayala*, 135 S. Ct. 2187, 2193 (2015) (applying the Antiterrorism and Effective Death Penalty Act and *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). *Ayala* involved *procedures* the trial court used in connection with a *Batson* challenge and distinguished cases involving structural errors which "require[ ] automatic reversal." *Id.* at 2197.

No. 15-70012

through the list of qualified prospective jurors in order, striking and accepting jurors as he went, until the State proffered a prospective jury of twelve. The defense then had an opportunity to strike or accept the proffered jurors.

The prosecutor struck two of the first three black jurors and accepted eleven of the first twelve white jurors, proffering an initial proposed jury of eleven white jurors and one black juror. After defense counsel struck several of those jurors, the State continued in the same manner, striking the next five black jurors (including Thomas Sturgis and David Minor who will become important), before accepting two black jurors. Even this low number is more than the State planned to accept. The prosecutor believed the second black juror had been struck for cause prior to the peremptory phase.

Ultimately, the prosecutor used eight of his thirteen strikes,[2] or 62%, against black jurors. Ten white jurors and two black jurors sat on the jury; both alternates were white.

Chamberlin objected to the strikes, arguing they constituted a prima facie case of discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986), which established a framework for determining if peremptory strikes are racially motivated. Applying *Batson*, the court asked the prosecutor if he had race-neutral reasons for the strikes. For the jurors relevant to this appeal, Sturgis and Minor, the prosecutor pointed to their answers to three questions on written questionnaires the jurors had completed before trial. The prosecutor claimed he struck them because of the answers they checked in response to questions 30, 34, and 35, in which both stated: (1) they were "not sure" if they were emotionally capable of announcing a verdict of death; (2) they were "not sure," because it was a capital case, if they would hold the State

---

[2] Each side had twelve strikes and two additional strikes for alternates. The State only exercised one strike when selecting alternates.

to a higher burden of proof than the law requires; and (3) "yes," because the defendant faced the death penalty, they would want to be one hundred percent certain before finding the defendant guilty.[3]

The trial court accepted these race-neutral reasons. Defense counsel responded by noting that Sturgis generally favored the death penalty and that Minor had no opinion on the death penalty, and, like other jurors the prosecutor had accepted, Minor had a relative in law enforcement. Based on "the totality of their questionnaire[s]," defense counsel argued, "it appears that they could be absolutely open- and fair-minded jurors on the question of the death penalty." Defense counsel also pointed out that the State had not sought to question Sturgis or Minor individually to follow up on their questionnaires. Without commenting on the defense's arguments, the trial court rejected the *Batson* claim.

The court did not conduct a "comparative juror analysis": an analysis of whether reasons given by the prosecutor for striking black jurors apply equally to white jurors the prosecutor accepted. *See Reed v. Quarterman*, 555 F.3d 364, 369 (5th Cir. 2009). Chamberlin did not point out, and the court did not consider, that a white juror the prosecutor had accepted, Brannon Cooper, gave

---

[3] The prosecutor offered the following reasons for striking Sturgis, juror 104:

Prosecutor:    No.104. Answer to question 30, "Are you emotionally capable of standing up in court and announcing your verdict?" Not sure. "Would you hold the state to a greater burden," on question 34. Not sure. Question No. 35, "Would you want to be a hundred percent certain?" Yes. I believe that's it on that one.

The prosecutor provided the same reasons for striking Minor, juror 106:

Prosecutor:    No. 106 . . . 106 to question 30, not sure [he's] capable emotionally of rendering a verdict. Not sure. That [he] would hold the state to a greater burden . . . No. 34, not sure whether they would hold us to a greater burden. Question No. 35, would require a hundred percent certainty. I believe that's it on that one.

No. 15-70012

the same answers as Sturgis and Minor to questions 30, 34, and 35. Like Sturgis and Minor, Cooper was "not sure" if he was "emotionally capable of standing up in court and announcing [a] verdict as to the defendant being put to death." Like them, he was "not sure" if he would "hold the state to a greater burden of proof than the law requires because this case is one in which the death penalty may be imposed." And, "because this case involves the death penalty," he would "want to be 100% certain" of guilt before returning a guilty verdict. Despite the three men giving the same answers, the prosecutor accepted Cooper yet struck Sturgis and Minor.[4]

On direct appeal, Chamberlin claimed she was entitled to relief on six grounds, including *Batson*. *Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008). Chamberlin again did not compare Sturgis and Minor to Cooper. Without conducting a comparative juror analysis, the Supreme Court of Mississippi denied relief, finding with regards to Sturgis and Minor that "the defense did not meet its burden to show that the facts and circumstances give rise to the inference that the prosecutor exercised the peremptory challenges with a discriminatory purpose." *Id.* at 339.[5]

---

[4] The defense later struck Cooper. This is "not relevant." *Miller-El v. Dretke*, 545 U.S. 231, 245 n.4 (2005) (*Miller-El II*). The "question is not what the defense thought about [Cooper] but whether the State was concerned about [the stated reason for the strike] when the juror was not black." *Id.*

[5] That state court decision rejecting the *Batson* claim on direct appeal is what is being reviewed in this federal petition for postconviction relief. We note, however, that the issue came up indirectly in the state postconviction proceeding as Chamberlin contended that her counsel was ineffective for failing to offer a comparative juror analysis in support of her *Batson* challenges. The Supreme Court of Mississippi rejected the claim, stating:

> [A] thorough review of the record in this case, including the jury questionnaires provided by Chamberlin, discloses that each of the African-American jurors struck had at least one response in his or her jury questionnaire that differentiated him or her from the white jurors who were accepted by the State. Therefore, we are unable to find disparate treatment of the struck jurors.

*Chamberlin v. State*, 55 So. 3d 1046, 1051–52 (Miss. 2010).

No. 15-70012

In her federal petition, Chamberlin asserted she was entitled to relief on thirteen grounds, including that the state court clearly erred when it found there was no *Batson* violation. *Chamberlin v. Fisher*, 2015 WL 1485901, at *12 n.3 (S.D. Miss. Mar. 31, 2015). The district court agreed: a *Batson* violation had occurred which warranted vacating Chamberlin's conviction and sentence. *Id.* at *21–23. The State appeals.

## III.

The district court granted the writ in a proceeding governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). It found that Chamberlin's *Batson* claim warranted federal relief under either of the two grounds on which a federal court can grant a writ based on a claim that was decided in state court. Those are when the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

The district court held that the legal error subsection (d)(1) describes existed because the Supreme Court of Mississippi did not conduct the comparative juror analysis used in *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*). It also held that the factual error subsection (d)(2) describes existed because, after using comparative juror analysis, it concluded that the state court's finding of race-neutral strikes for Sturgis and Minor was unreasonable.

We need not reach the section 2254(d)(1) question whether the state court contravened *Miller-El II* in failing to conduct a comparative juror analysis. *Compare McDaniels v. Kirkland*, 813 F.3d 770, 777 (9th Cir. 2015)

7

(en banc) (not deciding whether *Miller-El II* requires state courts to conduct comparative juror analysis when reviewing *Batson* claims), *with id.* at 782 (Ikuta, J., concurring) (arguing that "*Miller-El II* could not and did not establish any such rule" *requiring* state courts to conduct such analysis, though recognizing that comparative juror analysis may be used in conducting the section 2254(d)(2) inquiry). That is because we affirm the judgment on the ground that the Mississippi court's decision was based on an unreasonable determination of the facts under section 2254(d)(2). *See Miller-El II*, 545 U.S. at 240, 266 (granting relief under section 2254(d)(2)). In conducting that factual review, both the Supreme Court and this court have used the comparative juror analysis even when state courts rejecting the *Batson* claim never did. *See id.* at 241, 241 n.2 (conducting comparative analysis on habeas review despite no such analysis being presented to state courts); *Reed*, 555 F.3d at 372–73 (same); *Woodward v. Epps*, 580 F.3d 318, 338 (5th Cir. 2009) (same).

A court may grant relief for the factual error section 2254(d)(2) captures when it concludes that the state court's "decision was unreasonable or that the factual premise was incorrect." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*). The state court's factual findings are presumed to be sound unless the petitioner rebuts the "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The standard is demanding but not insatiable; . . . '[d]eference does not by definition preclude relief.'" *Miller-El II*, 545 U.S. at 240 (quoting *Miller-El I*, 537 U.S. at 340).

We recognize some ambiguity in the district court's opinion about whether it applied the deference that section 2254(d)(2) requires. It first states that because of the legal error it found under section (d)(1), no AEDPA deference to factual findings was required. In the next breath, however, it recognizes that Chamberlin "must demonstrate that the state court's factual findings were unreasonable in light of the evidence presented" and cited *Miller-*

*El II*'s use of the demanding "clear and convincing" standard required to overcome state court findings.[6]  We need not resolve this ambiguity because we can affirm on any ground supported by the record below.  *Dorsey v. Stephens*, 720 F.3d 309, 314 (5th Cir. 2013).  Applying AEDPA's deferential standard, we conclude that the state court's rejection of the *Batson* claim was based on an unreasonable determination of the facts.

The Supreme Court and this court have both granted writs based on findings that state courts had made unreasonable factual determinations in rejecting *Batson* claims.  *Miller-El II*, 545 U.S. at 266; *Reed*, 555 F.3d at 382. In doing so, those cases relied heavily on comparative juror analysis.  That analysis comes into play in the final stage of the *Batson* inquiry for determining whether a prosecutor used a peremptory strike in a racially discriminatory manner.  Before that point, the defendant must have first made a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race; in response, the prosecutor must have articulated a race-neutral reason for striking the juror in question.  *Batson*, 476 U.S. at 96–98. That requires the court to then make the ultimate determination whether the defendant carried her burden of proving purposeful discrimination.  *Batson*, 476 U.S. at 96–98; *see Purkett v. Elem*, 514 U.S. 765, 768 (1995).

"When the process reaches this step, the defendant may rely on all relevant circumstances to raise an inference of purposeful discrimination." *Fields v. Thaler*, 588 F.3d 270, 274 (5th Cir. 2009) (quoting *Miller–El II*, 545

---

[6] The district court elsewhere further recognized the deference to factual findings AEDPA requires, noting that "[f]actual findings are presumed to be correct, and the reviewing court defers to the state court's factual determinations," yet "[a] federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Chamberlin v. Fisher*, 2015 WL 1485901, at *11 (S.D. Miss. Mar. 31, 2015) (quoting *Miller-El I*, 537 U.S. at 340).

No. 15-70012

U.S. at 240) (internal quotation marks omitted).  The pattern of strikes here, while not dispositive, is compelling evidence of intentional discrimination.  *See Miller-El I*, 537 U.S. at 342; *Hayes v. Thaler*, 361 F. App'x 563, 570 (5th Cir. 2010).  The State struck nearly two times as many black jurors as it accepted (eight strikes compared to five accepted, including one alternate), while accepting more than four times as many white jurors as it struck (five strikes compared to twenty-three accepted, including three alternates).  It exercised 62% of its strikes on black jurors, despite black jurors making up only 31% of qualified prospective jurors.

In other words, black jurors were more than three times more likely to be struck by the prosecutor than white jurors.  "Happenstance is unlikely to produce this disparity."  *Miller-El II*, 545 U.S. at 241 (quoting *Miller-El I*, at 342); *Batson*, 476 U.S. at 93 (noting that "seriously disproportionate exclusion" of black jurors "is itself such an 'unequal application of the law . . . as to show intentional discrimination'").

The dissent disagrees with the conclusion we draw from these statistics, but does not call into question the fundamental point that the prosecutor was far more likely to strike black potential jurors than whites.[7]  To distract from that disparity, the dissent compares the number of black jurors the prosecutor accepted to the number of spots on the jury.[8]  This is not an illuminating

---

[7] The dissent takes issue with the sample size.  But the sample size in this case is the same as the one used to identify statistical disparities in *Miller-El*: 42 qualified jurors. *Miller-El I*, 537 U.S. at 331; *Miller-El II*, 545 U.S. at 240.

[8] The State chose not to strike four black jurors, two of whom were struck by the defense.  If all had been accepted by the defense, the dissent contends, the percentage of black jurors on the jury would have reflected the percentage of black jurors on the panel.  This does not account for the jury selection procedure used by the trial court.  Given that procedure, and the high rate at which the prosecutor accepted white potential jurors, there was never a possibility of all four black jurors accepted by the prosecutor being on the jury.  For example, the prosecutor only proffered the fourth black juror after eleven jurors (including nine white jurors) had already been seated, so, had the defense accepted the first three proffered black jurors, the jury would have been full.

comparison. To determine the prosecutor's pattern of strikes, it is most probative to compare apples to apples: the number of black jurors the prosecutor accepted to the total number of jurors he accepted. He did not accept twelve total jurors. He accepted twenty-four, less than 17% of whom were black. The mismatch between the metrics the dissent compares is apparent when applied to white prospective jurors. The government accepted twenty white jurors during jury selection, enough to compose a nonsensical 167% of the jury.

The sequence of the strikes is also telling. The State used the vast majority of its early strikes against black jurors (seven of its first nine, including its sixth against Sturgis and its eighth against Minor) and only later—after defense counsel's repeated objections and when it was running out of strikes—accepted the two black jurors who ended up on the jury (the second in a moment of confusion when the prosecutor believed the juror had already been struck). *See Miller-El II*, 545 U.S. at 249–50 (finding unpersuasive that, towards the end of jury selection, the prosecution accepted a black juror, noting that most of the prosecution's challenges were gone and the prosecutor "had to exercise prudent restraint" at that point).

But "the critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the

---

Even if the dissent's hypothetical jury could have existed, proportionate representation on a jury does not preclude a *Batson* challenge. Just as *Batson* does not guarantee a representative jury, a representative jury does not excuse discrimination against individual jurors when revealed through highly disproportionate strikes and discredited reasons for striking those jurors.

Further, that the defense struck two black jurors does not disprove the prosecutor's pattern of discriminatory strikes. *See Miller-El II*, 545 U.S. at 245 n.4 (emphasizing that *Batson* is concerned with the prosecutor's intent, determined without regard to "what the defense thought" about a juror the prosecutor accepted). Had the defense struck every black juror tendered that would not reduce the probative force of the prosecutor's disproportionate strikes.

prosecutor's justification for his peremptory strike." *Miller-El I,* 537 U.S. at 338–39. To determine whether a prosecutor's reason is persuasive, courts consider whether it was applied in a race-neutral way: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller–El II,* 545 U.S. at 240–41. Such "side-by-side comparisons," also common in employment discrimination cases,[9] are often "[m]ore powerful" than bare statistics. *Miller–El II,* 545 U.S. at 241.

This is the comparative juror analysis we have mentioned. It was used in *Miller-El II,* in which the state struck a potential black juror purportedly because he "said that he could only give death if he thought a person could not be rehabilitated." 545 U.S. at 243. If that were the real reason, the Court noted, the prosecutor "should have worried about a number of white panel members he accepted" who expressed similar views. *Id.* at 244–45. Likewise, although the prosecutor's purported reason for striking another prospective juror (that he considered death "an easy way out") was reasonable on its face, "its plausibility [wa]s severely undercut by the prosecution's failure to object to other panel members who expressed views much like [his.]" *Id.* at 247–48; *see also Foster v. Chatman,* 136 S. Ct. 1737, 1751 (2016) (finding "otherwise legitimate reason[s]" for striking prospective black jurors "difficult to credit in light of the State's acceptance of" white jurors to whom those reasons also applied); *Snyder,* 552 U. S. 472, 483 (same); *Reed,* 555 F.3d at 372–73 (same).

In *Miller-El II,* the Court found the prosecutor's reasons to be pretextual and thus powerful evidence of discrimination, even though other reasons the

---

[9] *See, e.g.*, *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) ("Disparate treatment occurs where an employer treats one employee more harshly than other 'similarly situated' employees for 'nearly identical' conduct.").

prosecutor gave for striking black jurors did not also apply to accepted white jurors. 545 U.S. at 247. For example, the prosecutor gave an additional reason for striking two black jurors—that they had relatives who had been convicted of a crime—which did not apply to the white jurors to whom the Court compared them. *Miller-El II*, 545 U.S. at 246–47; *id.* at 290–91 (Thomas, J., dissenting). The Court nonetheless rejected the argument that pretext can be found only when an accepted white juror "match[es] all" of the reasons the prosecutor gave for striking a black juror. *Id.* at 247 n.6 (quoting Thomas, J., dissenting). A rule that "no comparison is probative unless the situation of the individuals compared is identical in all respects" identified by the prosecutor would, it explained, "leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters."[10] *Id.*

The jurors "identical in all respects" that *Miller-El II* thought unlikely exist here. Every reason the prosecutor identified for excluding Sturgis and Minor applied to Cooper, the white juror who was not struck.[11] All three said they were "not sure" if they were emotionally capable of announcing a verdict of death; were "not sure" if they would hold the State to a higher burden of proof than the law requires given that it was a death penalty case; and "yes," they would want to be one hundred percent certain of the defendant's guilt before finding her guilty. Comparative juror analysis thus shows that the

---

[10] Similarly, *Reed* held that "the black and white jurors that we compare need not be exactly the same for us to conclude that the prosecution's proffered reasons for striking the black prospective jurors were pretexts for discrimination." 555 F.3d at 380.

[11] The identical responses are a product of written questionnaires with multiple choice responses, as opposed to the oral in-court responses considered in *Miller-El II* that produce more variety. This makes the comparative juror analysis more compelling evidence of discrimination than in *Miller-El II*. Unlike oral responses of numerous jurors that a prosecutor may forget when later exercising strikes, the written answers memorialize the responses. The prosecutor had all prospective jurors' answers in front of him when deciding whom to strike, a decision he had a night to consider, as the parties exercised peremptory strikes the day after they finished questioning potential jurors.

prosecutor's reason for striking Sturgis and Minor could not have been their answers to questions 30, 34, and 35.  Otherwise, he would not have accepted Cooper who had the same answers the prosecution did not like.  The perfect match among the answers of these jurors means that even more than in the other cases that have found pretext based on a comparative juror analysis, "[t]he prosecutors' chosen race-neutral reasons for the strikes do not hold up and are so far at odds with the evidence that pretext is the fair conclusion, indicating the very discrimination the explanations were meant to deny." *Miller-El II*, 545 U.S. at 265; *Snyder*, 552 U.S. at 485 ("The prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent."); *Reed*, 555 F.3d at 380–81 ("[T]he comparative analysis demonstrates what was really going on: the prosecution used its peremptory challenges to ensure that African–Americans would not serve.").

The State does not contest the obvious—that on the questions the prosecutor cited during jury selection as his reasons for excluding Sturgis and Minor, Cooper gave the same responses.  Instead, it argues that it should now be able to identify differences among those prospective jurors on their responses to other questions.  One example is the three prospective jurors' differing answers to a different question about the death penalty (question 53): Cooper was strongly in favor of the death penalty whereas Sturgis "generally favored" it and Minor had "no opinion."  The State and dissent urge us to accept this justification.  The problem is that *Miller-El II* rejected prosecutors' ability to justify their strikes based on reasons not offered during jury selection and appellate courts' ability to come up with new rationales on prosecutors' behalf:

> It is true that peremptories are often the subject of instinct and it can sometimes be hard to say what the reason is.  But when illegitimate grounds like race are an issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.  A *Batson* challenge does not

14

call for a mere exercise in thinking up any rational basis.  If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

545 U.S. at 252; *see also Reed*, 555 F.3d at 376 ("We must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors" (citing *Miller-El II*, 545 U.S. at 252)).

Despite this unequivocal command, the dissent argues we can nonetheless consider the jurors' views on questions not cited by the prosecutor after he was asked to justify the strikes.   It first says we should do so because *Miller-El II* instructed courts to evaluate whether a prosecutors' stated reason is plausible "in light of all evidence with a bearing on it."  545 U.S. at 251–52.  But that should not be read to provide an end run around the prohibition on considering new reasons set forth in the same opinion.  *Miller-El II* shows the difference between evidence bearing on plausibility, which reviewing courts should consider, and new reasons, which they may not.  In evaluating whether proffered reasons were plausible, *Miller-El II* looked to evidence of the prosecutor's veracity: did he rely on misrepresentations about stricken jurors' answers, accept jurors with similar answers to stricken jurors, or give inconsistent explanations for strikes?  *Id.* at 244–51.

In contrast, *Miller-El II* would not consider a new reason this court identified on appeal. *Id.* at 252.  The prosecutor initially had explained a strike by saying the potential juror thought the death penalty was "too easy on some defendants."  *Id.* at 250.  When the defendant pointed out during federal habeas that the same reason applied to white jurors the state accepted, this court found the real reason for the strike must have been the struck black juror's "general ambivalence about the [death] penalty and his ability to impose it."  *Id.* at 248–51.  *Miller-El II* rejected this approach, similar to that

of the dissent, because the "Court of Appeals's . . . substitution of a reason . . . does nothing to satisfy the prosecutor's burden." *Id.* at 252.

Other circuits conducting comparative jury analysis have also read *Miller-El II* as requiring that the "validity of a strike challenged under *Batson* must 'stand or fall' on the plausibility of the explanation given for it at the time, not new post hoc justifications." *United States v. Taylor*, 636 F.3d 901 (7th Cir. 2011); *see also Love v. Cate*, 449 F. App'x 570, 572 (9th Cir. 2011) (refusing to consider the State's post-trial explanation that white jurors it accepted "had non-racial characteristics that distinguished them from the black venire-member" the State struck because "the prosecutor never stated to the state trial court that he relied on these characteristics, even though *Batson* required him to articulate his reasons"); *McGahee v. Alabama Dep't Of Corr.*, 560 F.3d 1252, 1269 (11th Cir. 2009) (faulting the state appellate court for bolstering the prosecutor's reason with a new explanation when the "State never offered such a full explanation"). In *Taylor*, the only reason the prosecutor gave during jury selection for a strike was that the black juror was unwilling to impose the death penalty on a non-shooter, a position also taken by accepted white jurors. 636 F.3d at 903, 905. After a remand because of concerns about the strike, the district court credited a different justification: the jurors' differing views about the death penalty—which "the prosecutor did not say a word about" at trial—explained their disparate treatment. *Id.* at 905–06. In the opinion reversing, Judge Sykes explained that it was clear error to accept "new, unrelated reasons extending well beyond the prosecutor's original justification." *Id.* at 906.

The dissent thinks this prohibition on post-trial justifications can be overcome by repackaging the argument made by the State about the different answers to question 53. What the State candidly recognized is a new reason for striking the black jurors is now a new reason for keeping the white juror.

16

No. 15-70012

The dissent presumes the prosecution kept Cooper because of his answer to question 53, as it "might have alleviated the prosecution's concerns regarding his answers to questions 30, 34, and 35" that were identical to those of the struck black jurors. Dissent at 3. Of course, this is just the other side of the same coin. If the difference between the three was question 53, that would mean Sturgis and Minor were struck not only because of their answers to questions 30, 34, and 35, but also because of their more lukewarm support of the death penalty conveyed in response to question 53. As the "comparative juror analysis" name indicates, the inquiry is a comparative one that requires differentiating the answers of struck and accepted jurors. That means citing different answers to the same question as a reason for keeping one juror is the same as saying the difference was a reason for striking the other juror. To use a simple example, assume a prosecutor struck Jurors A and B on the ground that they wore hats in the courtroom. But Juror C was also wearing a hat. When this is later pointed out, the court speculates that Juror C must have been kept in the panel despite the hat because she expressed greater support for the death penalty on a questionnaire than did Jurors A and B. That would mean that the hat was not the dealbreaker; it alone was not enough for a strike as shown by the acceptance of Juror C. Jurors A and B thus would have been struck, per the court's conjecture, because they wore a hat and were less supportive of the death penalty. And if that were the case, *Miller-El II* says the prosecutor should have cited both of those reasons.

The dissent's position that courts may credit new reasons jurors were *kept* despite sharing the trait the prosecution claimed justified striking black jurors—a position for which it cites no authority—would make *Miller-El II*'s bar on considering new reasons for strikes meaningless. Take *Miller-El II* itself. The new reason for striking the black juror our court offered that the Supreme Court rejected—his ambivalence about the death penalty—could just

17

as easily have been treated as a reason for keeping the white jurors: their firmer support of the death penalty.  545 U.S. at 250–52.  Indeed, that is how the *Miller-El II* dissent characterized the difference.  *Id.* at 289 (Thomas, J., dissenting).   The *Miller-El II* majority's refusal to consider that new justification, whether framed as a reason for excluding the black juror or in opposite terms as a reason for keeping the white jurors, binds us.

The State argues that *Miller-El II*'s rule against after-the-fact justifications creates an unfair asymmetry in which it is held to the reasons it offered at trial whereas the defendant can wait until the appeal to identify jurors like Cooper who have the same answers as people who were struck. Whatever the soundness of this complaint, it again is rejected by the leading decisions employing comparative juror analysis.  *See Miller-El II*, 545 U.S. at 240 (conducting comparative analysis on habeas review despite no such analysis being presented to state courts); *Reed*, 555 F.3d at 372–73 (same); *Woodward*, 580 F.3d  at 338 (same); *see also Smith v. Cain*, 708 F.3d 628, 638 (5th Cir. 2013) ("[A]lthough Smith did not point to specific jurors for comparative analysis, we have conducted an in-depth review of the record . . . .").  That Chamberlin's counsel did not rebut the reasons presented by the prosecutor during jury selection is also beside the point.  *See Woodward*, 580 F.3d at 338 (holding in a section 2254 review that a comparative analysis is appropriate even when defense counsel did not rebut the prosecutor's stated reasons for striking jurors at trial) (citing *Reed*, 555 F.3d at 364)).  These and the other arguments the State makes challenging the impact of comparative juror analysis also ignore that the approach is utilized only at the final stage of the *Batson* inquiry, which a trial court need not reach if it has properly found that the defendant did not establish a prima facie case of discrimination.  And at that final stage, after the serious accusation of racial discrimination has

been leveled and a prima facie case to support it found,[12] it does not seem too much to ask prosecutors to list all the reasons justifying their strikes.

Although *Miller-El II* and *Reed* focus on comparative juror analysis in holding that the state courts' factual finding of no *Batson* violation met AEDPA's threshold of unreasonableness, those opinions also cite other evidence that supported that conclusion.   In *Miller-El II*, the prosecutor had requested multiple jury shuffles, questioned jurors of different races inconsistently, and the Dallas district attorney's office had a history of racial discrimination.   *Id*. at 255–66.   *Reed* involved the same district attorney's office and cited its history.  555 F.3d at 381–82; *see also Foster*, 136 S. Ct. at 1754 (stating that in addition to a comparative juror analysis "the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file" were evidence of discriminatory motive).

But both our court (in an unpublished case) and another circuit have issued writs under AEDPA relying solely on comparative juror analysis to find a *Batson* violation.  *Hayes*, 361 F. App'x at 573; *see also Drain v. Woods*, 595 F. App'x 558, 571–81 (6th Cir. 2014) (granting writ by finding a *Batson* violation relying only on a comparative juror analysis).[13]  That is not surprising as we have recognized since the early years of addressing *Batson* claims that the

---

[12] Though no doubt a grave matter, concluding that prosecutors intentionally excluded jurors because of their race is not tantamount to a finding that they are racist as the dissent asserts.  There is a body of literature and jury consultants focused on using demographics to predict juror behavior.  *See Miller-El II*, 545 U.S. at 270–71 (Breyer, J., concurring) (citing such sources in concluding that "the use of race- and gender-based stereotypes in the jury-selection process seems better organized and more systematized than ever before").  Of course, this more "benign" motive of trying to obtain a strategic advantage still results in a constitutional violation if jurors are excluded because they are part of a protected demographic group.  *Id*. at 271.

[13] Both *Hayes* and *Drain* granted habeas relief under section (d)(1) because the trial courts in those cases conducted comparative juror analysis but failed to follow the Supreme Court's clearly established protocol for doing so.  *Hayes*, 361 F. App'x. at 570–73; *Drain*, 595 F. at 580.

"decisive question will normally be whether a proffered race-neutral reason should be believed" because "there will seldom be any evidence that the claimant can introduce—beyond arguing that the explanations are not believable or pointing out that similar claims can be made about non-excluded jurors who are not minorities." *United States v. Bentley-Smith*, 2 F.3d 1368, 1373–74 (5th Cir. 1993); *cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (explaining that general principles of evidence law allow a factfinder to "reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"). When all of a prosecutor's reasons are shown to be pretextual, it is hard to see how a court could reasonably find those reasons credible. *See Miller-El I,* 537 U.S. at 338–39 (deeming *Batson*'s "critical question" the credibility of the prosecutor's reason).

In any event, there is more here than just the discrediting of the prosecutor's explanation that comparative juror analysis compels us to find. Jury selection involved a definitive pattern of the prosecution striking black jurors, resulting in a stark disparity in the percentage of blacks struck as opposed to whites. And because a seated white juror gave identical answers to those cited in excluding the two black venire members, there is an absence of any nonpretextual justification for the strikes. *Contrast Miller-El II*, 545 U.S. at 246–47, 247 n.6 (finding *Batson* violation even though the struck black venire member gave answers about rehabilitation and his brother's criminal history that were not also provided by the accepted white jurors). Clear and convincing evidence, including more damning comparative juror analysis than existed in *Miller-El II* or *Reed*, thus rebuts the state court's finding of no discrimination. It was unreasonable not to conclude that the strikes of Sturgis and Minor were "motivated in substantial part by discriminatory intent." *Snyder*, 552 U. S. at 478, 485.

The dissent argues that we are creating a system that allows adept prosecutors to avoid comparative juror analysis by giving vague and broad reasons for their strikes. But in response to such reasons, *Batson* obligates the trial judge to require that the prosecutor give a "clear and reasonably specific" explanation for a challenge. 476 U.S. at 98 n.20. More fundamentally, ease of evasion is not just a criticism of *Miller-El II*'s comparative juror analysis, it has been a basis for attacking the *Batson* framework from the beginning. *See Batson*, 476 U.S. at 106 (Marshall, J., concurring); *Rice v. Collins*, 546 U.S. 333, 343 (2006) (Breyer, J., concurring). It would only exacerbate that problem to ignore *Batson* violations when the record reveals them.

**\* \* \***

"Two peremptory strikes on the basis of race are two more than the Constitution allows." *Foster*, 136 S. Ct. at 1755. Chamberlin is entitled to a new trial before a jury selected without regard to race. The judgment of the district court is AFFIRMED

No. 15-70012

EDITH BROWN CLEMENT, Circuit Judge, dissenting:

A mixed-race jury convicts a defendant of a heinous capital crime, and through its questionable characterization of certain essential facts, disregarding of others, and misreading of binding precedent, the majority finds invidious racial discrimination against black prospective jurors where none existed. The result not only unfairly tarnishes an individual prosecutor's reputation, it also puts an impossible burden on all prosecutors and makes application of the *Batson* test more difficult going forward. I respectfully dissent.

A.     Makeup of the Jury

The majority makes much of the fact that, within a very small sample space, the prosecution struck a higher percentage of prospective black jurors from the venire than white jurors. The majority is not mistaken as a mathematical matter, but it does paint a misleading picture by ignoring those statistical facts that do not support its conclusions. The majority notes, for example, that black jurors made up "31% of qualified prospective jurors," but downplays the essential fact that the prosecution ultimately tendered four black jurors which—had all four been accepted by the defense—would have constituted 28.5% of the jury (including the two alternates). Thus, the jury eventually tendered by the prosecution was a near-perfect representation of the racial makeup of the venire from which it was chosen.

In attempting to waive off this inconvenient statistical truth, the majority states in a footnote that, because the fourth black juror was tendered by the prosecution after eleven jurors had been seated, that fourth juror would not have been considered were it not for the defense itself striking two black jurors tendered by the prosecution. But the defense *did* strike the black jurors, and the prosecution *did* tender four black prospective jurors. The majority attempts to avoid these facts by referencing a footnote in *Miller El II* to

No. 15-70012

conclude "that the defense str[iking] some black jurors is not relevant to the prosecutor's pattern of discriminatory strikes." But the cited footnote in *Miller-El II* explains that whether the defense strikes a *white* juror has no bearing on the question of whether the prosecution discriminated in its use of strikes against *black* jurors. *See Miller-El II*, 545 U.S. 231, 244–45 n.4 (2005) (explaining that the defense striking white juror Witt was "not relevant" to the question of whether the prosecution's proffered race-neutral reasons for striking a black juror were pretextual). Here, by contrast, the defense striking some *black* jurors who had been tendered by the prosecution is relevant to the particular question of how many black jurors were ultimately tendered by the prosecution in total, because the defense's strikes clearly impacted the way the prosecution went about exercising its strikes going forward.

And, in any case, even if the fourth black juror is not counted, the prosecution still tendered a jury that was 25% black. To believe the majority, then, is to believe that the prosecution decided to racially discriminate against black jurors—but only to the extent necessary to reduce proportional representation on the jury from 31% to 25%. Tepid invidious discrimination indeed.[1]

---

[1] The majority argues that these numbers are irrelevant and that the more useful method is to divide the number of black jurors proffered by the total number of jurors proffered. Of course, this calculation suffers from precisely the same malady the majority claims to identify in my calculation: there is no such thing as a twenty-four person jury, so the total number of jurors proffered is not relevant. Had the defense accepted all of the prosecution's proffered jurors, applying the trial court's jury selection method, the jury including alternates would have included four black members, or 28.5% of the total. And, even accepting *dubitante* the majority's premise, the prosecution ultimately proffered a jury pool of twenty-four that was 16.67% black (4/24). Thus, granting the majority's strained reasoning, the prosecution evidently was motivated by racial animus to the extent necessary to reduce black representation in the jury pool from 31% to 16.67%. I reiterate: tepid invidious discrimination indeed.

B.     Side-By-Side Comparison

More egregious errors of law and fact permeate the majority's discussion of the district court's side-by-side comparison of jurors Sturgis and Minor (black) with Cooper (white).

When asked to give race-neutral reasons for striking Sturgis and Minor, the prosecution pointed to their answers to questions 30, 34, and 35 on the juror questionnaire. Both Sturgis and Minor answered all three questions in ways that indicated they might be uncomfortable rendering a guilty verdict resulting in the death penalty, or hold the prosecution to a higher burden of proof than is legally required. The majority cannot—and does not—dispute that the prosecution's proffered explanations are plausible and race-neutral on their face. Instead, the majority turns to the questionnaire of a white juror, Cooper, who answered questions 30, 34, and 35 in the same way as Sturgis and Minor but who was not struck by the prosecution. From this fact alone the majority concludes "that the prosecutor's reason for striking Sturgis and Minor could not have been their answers to [the three questions]. Otherwise, he would not have accepted Cooper who has the same answers the prosecution did not like."

But if Cooper gave answers to *other* questions that might have alleviated the prosecution's concerns regarding his answers to questions 30, 34, and 35, then the majority's conclusion simply does not follow. And that is precisely what happened here. Cooper answered question 53, which asked jurors to circle the response that best matched their opinion on the death penalty, by circling "Strongly Favor" and then writing in by hand "for rape, murder, child abuse, [and] spousal abuse." Sturgis and Minor, by contrast, circled "Generally Favor" and "No Opinion," respectively. Reviewing the record in its totality, then, shows that the most logical explanation for the prosecution's not striking Cooper was not because he was white while Sturgis and Minor were black, but

because Cooper was a more favorable juror based on his answers to other questions on the questionnaire.

Indeed, the district court acknowledged that Cooper was a more desirable juror for the prosecution, yet refused to consider that fact in its analysis of the prosecution's supposedly discriminatory intent because Cooper's answer to question 53 "was not a rationale offered by the prosecutor." The majority agrees with the district court on this point, citing to *Miller-El II* for the proposition that prosecutors may not "justify their strikes based on reasons not offered during jury selection." On this point, the majority simply misreads the Supreme Court's directive in *Miller-El II*.

It is true that, as the majority emphasizes, the Court explained in *Miller-El II* that a "prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Miller-El II*, 545 U.S. at 252. But that does not mean that a reviewing court is prohibited from looking through the record to decide whether the proffered explanations are, in fact, plausible. Indeed, as the Court also explained, when a prosecutor gives a reason for striking a black juror, a reviewing court must "assess the plausibility of that reason *in light of all evidence with a bearing on it.*" *Id.* at 251–52 (emphasis added). That makes perfect sense—it would be quite strange to suggest that a court must decide the plausibility of a given race-neutral explanation, but is not allowed to study the record evidence necessary to make that determination.

In Chamberlin's case, Cooper's answer to question 53 is not a new post-facto explanation invented by the prosecution. It is rather evidence "bearing on" the essential question here: whether or not Sturgis and Minor's answers to 30, 34, and 35 could plausibly have been the reason why they were struck. That Cooper offered answers to other questions which logically could have assuaged any concerns the prosecution may have had regarding his answers to those

specific three questions undermines the majority's conclusion that the prosecution's proffered race-neutral explanations were pretextual. This is precisely the type of evidence courts should consider in making that determination.

The majority argues that "citing different answers to the same question as a reason for keeping one juror is the same as saying the difference was a reason for striking the other juror." The majority is mistaken. Consider this hypothetical, which closely tracks the scenario before us here:

1. Prosecutor decides, as a default position, to strike all jurors who express concerns about the legal burden of proof.

2. Prosecutor reviews juror questionnaires and notes that Jurors A, B (both black) and C (white) have expressed concerns about the legal burden of proof. Consequently, Prosecutor intends to strike all three by default.

3. Upon further review, Prosecutor notes that Juror C alone strongly favors the death penalty. Because this is a capital case, Prosecutor decides to make an exception to the default rule and retain Juror C because of his favorable death penalty views.

4. Prosecutor strikes Jurors A and B as planned. Responding to a *Batson* challenge, Prosecutor explains that A and B both expressed concerns about the legal burden of proof.

5. Prosecutor never mentions white Juror C because the law does not require Prosecutor to explain why he decided to keep any specific juror.

Applying the majority's reasoning, *Juror C*'s answer to an entirely separate question must count as a reason why *Jurors A and B* were struck. The majority would therefore require our hypothetical Prosecutor to explain to the trial court his reasons for *keeping* white Juror C, or else be vulnerable to the accusation

that he invidiously discriminated against Jurors A and B because they were black. That is not what *Miller-El II* requires.

Furthermore, although the majority stresses one passage in *Miller-El II*, it does not properly consider the rest of that opinion. The *Miller-El II* Court admittedly acknowledged that side-by-side comparisons can provide useful "evidence tending to prove purposeful discrimination," but it emphatically did not rely exclusively or even primarily on strict side-by-side comparisons in concluding that the prosecution had discriminated against black prospective jurors. *Id.* at 241. The Court emphasized that the prosecution in *Miller-El II* had: (1) intentionally "mischaracterized" the testimony of a black juror who would otherwise have been an "ideal juror in the eyes of a prosecutor seeking a death sentence" to exercise a strike against him, *id.* at 244, 247; (2) used a "jury shuffle" to move black jurors to the end of the voir dire line, *see id.* at 253; (3) used differently-worded questions for black jurors designed to elicit responses indicating a negative feeling towards the death penalty, *see id.* at 255–60; (4) in some cases used what the Court itself called "trickery" in asking questions designed to create cause to strike black jurors, *see id.* at 261–63; and (5) had "for decades" prior to the case "systematically exclude[d] blacks from juries." *Id.* at 263.

*Absolutely none* of these other indicators of discriminatory intent that the *Miller-El II* Court relied on are present in Chamberlin's case. Indeed, so far as I can tell, the *entirety* of the majority's conclusion rests on (1) a tendentious statistical account of a tiny sample space, and (2) comparing the answers to three questions out of dozens in a questionnaire by three jurors out of a pool of 42. It is unlikely that such evidence would be sufficient on *de novo* review; to suggest that it constitutes *clear and convincing* evidence that the state court's factual determination was unreasonable is to render entirely meaningless that standard of review.

The practical import of the majority's holding for future prosecutors seeking to avoid charges of racial discrimination reveals the untenability of the majority's ruling. The majority refuses to listen to any argument from the prosecution as to why it *did not* strike Cooper because such evidence was not raised during jury selection. But, as I noted above, there was *no reason* for the prosecution to provide detailed reasons for why it decided not to strike him—because Cooper was not a black juror who was being struck.[2] In other words, to avoid the result reached by the majority here, during jury selection the prosecution would not only have had to explain why it struck specific black jurors—as it did—but also why it did *not* strike all white prospective jurors as well. There is nothing in *Batson, Miller-El II*, or any other case that compels anything of the sort.

Even worse, the majority's opinion has the perverse effect of incentivizing prosecutors to be *less* detailed when giving their race-neutral reasons for striking black jurors. What if the prosecution in Chamberlin's case had not honestly pointed to the specific answers on Sturgis's and Minor's questionnaires which gave the government pause? Imagine instead that the prosecution simply stated that Sturgis's and Minor's "answers to the jury questionnaire as a whole" had led the prosecution to believe "that they were likely to apply an incorrect standard of review and were uncomfortable with the death penalty." In such a case, the formalistic side-by-side comparison the majority engages in here would be impossible. To insulate themselves from

---

[2] The district court's suggestion that the prosecution could have "augment[ed] the record" to explain why it wanted to keep Cooper is absurd as a practical matter. Such a rule would compel the prosecution to reveal to the defense key parts of its trial strategy by forcing the prosecution to explain why it favored certain jurors for the case. Furthermore, there is nothing in any precedent from the Supreme Court or this court suggesting that the *Batson* burden-shifting scheme puts any responsibility on the prosecution to explain why it did not strike white jurors.

accusations of racism, savvy prosecutors will recognize that the more general their proffered race-neutral reasons are, the harder it will be for an overzealous reviewing court to poke holes in them later.

\*     \*     \*

To be told by a court of law that you have engaged in invidious racial discrimination is no small thing. To be told that you may not offer essential evidence to defend against the charge is even worse. With its opinion, the majority sends a stern message indeed to future prosecutors: be sure to explain out loud not just every peremptory strike but also every non-strike at jury selection, or else be labelled a racist by the very courts to which you have devoted your career.[3] I would strongly urge my colleagues to reconsider whether that is truly the message we want to send.

---

[3] The majority suggests in a footnote that being accused of striking jurors on the basis of their race is not the same as being called a racist, because a prosecutor may simply be trying to "us[e] demographics to predict juror behavior." This distinction is facile: the premise underlying the use of race to predict juror behavior—that the color of one's skin can be relied upon to predict how one will view a given piece of evidence or evaluate certain testimony—is itself fundamentally racist. To be told as a Prosecutor that you have engaged in such shenanigans is, again, no small thing.